HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALASKA VILLAGE ELECTRIC COOPERATIVE, INC.,

   Plaintiff,

   v.

ZURICH AMERICAN INSURANCE COMPANY, et al.,

   Defendants.

CASE NO. C11-1375RAJ

CONSOLIDATED

ORDER

## I. INTRODUCTION

This matter comes before the court on cross-motions for summary judgment. No party requested oral argument, and the court finds oral argument unnecessary. For the reasons stated below, the court GRANTS Defendants' motion (Dkt. # 26), DENIES Plaintiff's motion (Dkt. # 30), and directs the clerk to enter judgment for Defendants.

## II. BACKGROUND

In 2010, Microgen Technologies, Inc. ("Microgen"), through its agent Vitus Marine, LLC ("Vitus"), negotiated with Sneed Shipbuilding, Inc. ("Sneed") to build two barges that Microgen's parent company, Alaska Village Electrical Cooperative, Inc. ("AVEC") would use to haul heating oil in Alaska. Microgen, Sneed, and Vitus agreed to obtain a builder's risk policy to cover the barges during construction. In negotiations that took place largely in Seattle, they agreed on a construction contract that required

ORDER – 1

Sneed to obtain an American Institute of Marine Underwriters standard shipbuilder's risk insurance policy, except that their policy would omit "Addendum 2." The court will consider the import of this omission in its later analysis.

The parties used Vitus's Seattle-based insurance broker to seek out subscribing underwriters for the policy they preferred (the "Policy"). Although some underwriters balked at writing a policy that omitted Addendum 2, eventually five companies agreed to underwrite the Policy. Zurich American Insurance Company was the lead underwriter, and the court will use the term "Zurich" to refer collectively to the five-underwriter consortium. The Policy insured Sneed, Vitus, and Microgen.

When Sneed, a Texas corporation, built the barges at its Texas facilities, it made a series of substandard welds. An inspector discovered them. Sneed removed the faulty welds and replaced them at a cost in excess of a million dollars. No one disputes that Sneed's faulty workmanship was the sole cause of the defective welds.

Not long after the repairs, the parties submitted a claim to Zurich. Zurich quickly denied the claim. The day after Zurich denied the claim, AVEC (as the assignee of the policy rights of Microgen, Sneed, and Vitus) sued in this court, while Zurich sued in the United States District Court for the Southern District of Texas. AVEC sued for breach of the Policy, bad faith, and violations of the Washington Consumer Protection Act ("CPA") and the Washington Insurance Fair Conduct Act ("IFCA"). Zurich sought a declaratory judgment that it had properly denied its insureds' claim. In October 2011, the Texas court granted the insureds' motion to transfer venue here. This court consolidated Zurich's declaratory judgment motion with AVEC's suit.

The court now considers the parties' cross-motions for summary judgment.

### III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred*

ORDER – 2

*Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

At the threshold, the parties disagree over what state's law should apply to their dispute.[1] Zurich reasons that Texas law should apply because Sneed, a Texas corporation, built the two barges at its Texas facilities, in accordance with a construction contract requiring the application of Texas law. AVEC urges the application of Washington law, contending that the parties negotiated both the construction contract and the Policy in Washington, and that a Washington insurance broker solicited Zurich to underwrite the Policy. Although the court will apply Washington law, it does so only because the outcome of this dispute would be the same under Washington or Texas law. Although AVEC insists on Washington law and Zurich insists on Texas law, neither of them suggests that either state's courts would interpret the Policy differently. The court finds no need to conduct a conflict-of-laws analysis.

---

[1] The parties at least agree that state law, rather than federal maritime law, governs this insurance dispute. *See Bank of San Pedro v. Forbes Westar, Inc.,* 53 F.3d 273, 275 (9th Cir. 1995) ("We, like Congress, leave the regulation of marine insurance where it has been - with the States.") (quoting *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 321 (1955)). Absent a "federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice," state law governs the interpretation of a maritime insurance policy. *Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506, 509-10 (9th Cir. 1984); *see also Kitma AS v. Royal Ins. Co.*, 9 P.3d 239, 242 (Wash. Ct. App. 2000) (noting that Washington choice of law rules employ the *Wilburn Boat* analysis).

ORDER – 3

In Washington, insurance policy interpretation is a legal question. *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002) ("Interpretation of insurance policies is a question of law, in which the policy is construed as a whole and each clause is given force and effect."). The court must give the terms of the policy a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Id*. (internal quotation omitted). Terms defined within a policy are to be construed as defined, while undefined terms are given their "ordinary and common meaning, not their technical, legal meaning." *Allstate Ins. Co. v. Peasley*, 932 P.2d 1244, 1246 (Wash. 1997). Dictionaries may assist in determining the ordinary meaning of a term. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (Wash. 1990). If policy language on its face is fairly susceptible to two different but reasonable interpretations, ambiguity exists. *Peasley*, 932 P.2d at 1246 (cited in *Petersen-Gonzales v. Garcia*, 86 P.3d 210 (Wash. Ct. App. 2004)); *Allstate Ins. Co. v. Hammonds*, 865 P.2d 560, 562 (Wash. Ct. App. 1994) (ambiguity exists "when, reading the contract as a whole, two reasonable and fair interpretations are possible."). Extrinsic evidence may provide the meaning of an ambiguous term, but only where that evidence shows that both parties to the policy intended a particular meaning. *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Const. Co.*, 951 P.2d 250, 256 (Wash. 1998); *see also Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005).

A. **Courts Have Consistently Construed the Language in the Policy to Exclude Coverage for the Cost of Repairing Faulty Workmanship.**

The initial burden to establish a covered loss falls on AVEC, as the insured. *Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co.*, 87 P.3d 774, 784 (Wash. Ct. App. 2004). To satisfy that burden, AVEC points to a single clause from the "Hull Risks" section of the Policy. It provides as follows:

> This Policy insures against all risks of physical loss of or damage to the Vessel[s] occurring during the currency of this Policy, except as hereinafter provided.

ORDER – 4

Policy at Part I.[2]  Although AVEC argues that the omission of Addendum 2 from the Policy informs the meaning of this clause (the "All-Risks Clause"), it does not suggest that any other clause in the Policy is relevant.  Although the court will consider the impact of Addendum 2 in the next section, the court begins its analysis with the plain meaning of the All-Risks Clause.

In Texas, the All-Risks Clause does not cover repairs to faulty workmanship in the construction of a vessel.  In *N. Am. Shipbuilding, Inc. ("NAS") v. S. Mar. & Aviation Underwriting, Inc.*, 930 S.W.2d 829, 834 (Tex. Ct. App. 1996), the court held that "the language 'physical loss of or damage to the vessel' does not cover the cost of repairing faulty initial construction."  Just as in this case, the *NAS* court considered a claim from a shipbuilder for the cost of repairing faulty welds.  *Id.* at 831.  To reach its decision, the *NAS* court considered the analysis of the Fifth Circuit in *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267 (5th Cir. 1990), in which the court applied Louisiana law to a similar dispute over the All-Risks Clause.  The *Trinity* court reasoned as follows:

> The language "physical loss or damage" strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state—for example, the car was undamaged before the collision dented the bumper.  It would not ordinarily be thought to encompass faulty initial construction.

916 F.2d at 270-71.  Although the *Trinity* court would have found coverage for "accidents resulting from defective design or workmanship," it found no coverage for "the cost of repairing defective initial construction."  *Id.* at 271.  Because the case arose in the context of a shipbuilder seeking indemnification for an arbitration award in favor of the ship owner, the *Trinity* court also reached an alternative holding that the policy did not cover liability arising from the arbitration contract.  *Id.*  The *NAS* court adopted the first holding from *Trinity*—that the All-Risks Clause did not cover faulty construction.  930 S.W.2d at 834 (recognizing twin holdings from *Trinity*).  It found that Texas policy-

---

[2] The court relies on the version of the Policy at Exhibit A to the declaration of G. Desmond Serpanchy.  Dkt. # 27.

ORDER – 5

interpretation law did not differ materially from the Louisiana law that the *Trinity* court applied. *Id.* If the policy-interpretation law of Texas or Louisiana differs (in a way that is material to this dispute) from the Washington-law principles that this court has already summarized, no party has pointed out that difference. *See NAS*, 930 S.W.2d at 834 (summarizing Texas and Louisiana law).

At least one Washington court has found no relevant difference between Washington law, Texas law, and Louisiana law for purposes of interpreting the All-Risks Clause. In *Wolstein v. Yorkshire Ins. Co.*, 985 P.2d 400, 407 (Wash. Ct. App. 1999), the Washington Court of Appeals found *NAS* and *Trinity* persuasive. "[P]ersuaded by the reasoning in [*Trinity* and *NAS*]," the *Wolstein* court found "that the hull risks provision of the builder's risk policy . . . does not provide coverage to pay . . . to repair faulty workmanship." 985 P.2d at 408.

In light of *Wolstein*, the court holds that the All-Risks Clause does not cover the cost of repairing Sneed's faulty welds in AVEC's barges. As the court will now discuss, the choice to eliminate Addendum 2 from the Policy does not change the court's holding.

**B.    The Omission of Addendum 2 Does Not Change the Meaning of the Policy with Respect to Coverage for Repairs to Faulty Workmanship.**

AVEC insists that the critical distinction between this case and *NAS*, *Trinity*, and *Wolstein* is that unlike the insureds in those cases, it negotiated for a policy that omitted Addendum 2. Addendum 2 would have modified the All-Risks Clause as follows:

> Further, Underwriters shall not pay for any loss, damage or expense caused by or arising in consequence of:
>
> a) faulty workmanship or the installation or use of improper or defective materials, unless resulting in [certain damage to the Vessel not otherwise excluded from the terms and conditions of the Policy];
>
> b) faulty production or assembly procedures even if constituting faulty design

ORDER – 6

Pltf.'s Mot. (Dkt. # 30) at 3-4.[3]  AVEC describes Addendum 2 as an exclusion of coverage for faulty workmanship and faulty production procedures.

AVEC reasons that its insistence on the elimination of Addendum 2 and Zurich's capitulation to that condition demonstrate that the Policy covers the cost of repairing faulty workmanship.  For several reasons, the court disagrees.

First, the court disagrees with AVEC's characterization of Addendum 2 as an exclusion for the cost of repairing faulty work.  Addendum 2 makes modifications to the All-Risks clause that have no bearing on coverage for the cost of repairing faulty workmanship.  For example, as the *Trinity* court first noted, whereas the All-Risks Clause does not cover the cost of repairing faulty workmanship, it covers "accidents resulting from defective design or workmanship . . . ."  916 F.2d at 271; *see also NAS*, 930 S.W.2d at 833 (quoting this portion of *Trinity*); *Wolstein*, 985 P.2d at 408 (same).  The addition of Addendum 2, however, changes that result, because it excludes all losses "caused by or arising in consequence of" faulty workmanship.  Similarly, Addendum 2 deletes a second paragraph of the standard all-risks clause that provides coverage for damage caused by defective design and replaces it with an exclusion for damages arising in consequence of "faulty production or assembly procedures" even where those faults constitute "faulty design."

Second, the All-Risks Clause does not cover the cost of repairing faulty workmanship, meaning that AVEC cannot rely on the presence or absence of an alleged exclusion of those costs.  In *NAS*, the court considered an insured's argument based on the second paragraph of the All-Risks Clause.  That paragraph (which is also present in the Policy at issue in this case) provides that "[i]n the event that faulty design of any part

---

[3] The court quotes Addendum 2 as AVEC recites it in its motion. The attorney who represented Microgen during the negotiation of the vessel construction contract offers an overview of the content and history of Addendum 2.  Bauer Decl. (Dkt. # 32).  The court suggests no opinion on that overview, it merely considers Addendum 2 just as AVEC contends it would have appeared in the Policy had it not negotiated for its omission.

ORDER – 7

or parts should cause physical loss of or damage to the Vessel, this insurance shall not cover the cost or expense of repairing, replacing or renewing such part or parts . . . ." 930 S.W.2d at 831 (quoting policy); Policy Part I (identical language in AVEC Policy). The insured in *NAS* reasoned that if the All-Risks Clause specifically excludes damages resulting from faulty design, its failure to exclude specifically damages arising from "faulty initial construction" meant that such damages are covered. 930 S.W.2d at 835. The *NAS* court rejected the argument, explaining that "*Trinity* makes clear that these types of damages need not be 'excluded' from an all risks policy *because they are not covered to begin with*." *Id.* (emphasis added). The *Wolstein* court adopted the same reasoning. 985 P.2d at 408 (quoting *NAS*). In other words, AVEC cannot rely on the absence of a purported exclusion from faulty-workmanship coverage in its Policy, it must point to an affirmative *inclusion* of coverage for such damages in its Policy. It cannot do so.

AVEC also offers evidence that Vitus, Microgen, and Sneed insisted on a policy without Addendum 2 because they wanted a policy that would cover the cost of repairing faulty workmanship. This is extrinsic evidence, and in Washington, extrinsic evidence is relevant only where a term or clause in an insurance policy is ambiguous. *See*, *e.g.*, *B&L Trucking & Const. Co.*, 951 P.2d at 256. *Wolstein* disposes of the contention that the All-Risks Clause is ambiguous, so AVEC's extrinsic evidence is not relevant. Even if the court were to put aside the lack of ambiguity, however, and assuming for the sake of argument that AVEC's evidence actually demonstrates that Vitus, Microgen, and Sneed intended the All-Risks Clause to cover the cost of repairing faulty workmanship, AVEC's extrinsic evidence would not lead to a different outcome.

What AVEC's evidence does not demonstrate, as a matter of law, is that Vitus, Microgen, Sneed, or anyone acting on their behalf communicated to any insurer that they desired a policy that would provide coverage for the cost of repairing faulty

ORDER – 8

workmanship. As the court has already observed, extrinsic evidence can illuminate the meaning of an insurance clause only where that evidence indicates that *both* parties intended a particular meaning. *B&L Trucking & Const. Co.*, 951 P.2d at 256 (discerning "no extrinsic evidence from the record indicating an intent by both parties to exclude coverage"). Here, there is no evidence that Zurich or any of its co-underwriters intended the All-Risks clause to cover the cost of repairing faulty workmanship. The court accepts, for purposes of this motion, the disputed declaration of Microgen's counsel that he informed all of the underwriters during negotiations that the Policy omitted Addendum 2 in order to ensure coverage for risks arising out of faulty workmanship that Addendum 2 excludes. As the court has just discussed, Addendum 2 does not exclude the costs of repairing faulty workmanship, because the standard policy does not cover those costs. Instead, Addendum 2 excludes coverage for accidents resulting from faulty workmanship. That the underwriters agreed to cover those losses does not suggest they intended to cover the cost of repairing faulty workmanship. AVEC has demonstrated only that the underwriters were aware that Addendum 2 was absent from the Policy, not that they were aware of the meaning that Vitus, Sneed, and Microgen allegedly ascribed to that omission. There is no evidence that the underwriters shared their insureds' intent that the All-Risks Clause mean something different than the meaning announced in *Trinity*, *NAS*, and *Wolstein*. Indeed, despite their initial reservations, none of the underwriters increased their premiums despite their agreement to subscribe to the Policy without Addendum 2.

For these reasons, the court concludes that the Policy does not cover the cost of repairing Sneed's faulty welds. The court thus rules that Zurich did not breach the Policy as a matter of law. AVEC has articulated no bad faith, IFCA, or CPA claim that does not depend on its assertion that Zurich erroneously denied coverage. The court accordingly grants summary judgment against those claims as well.

ORDER – 9

### IV.  CONCLUSION

For the reasons stated above, the court GRANTS Defendants' motion for summary judgment (Dkt. # 26) and DENIES Plaintiff's motion for summary judgment (Dkt. # 30). The court directs the clerk to enter judgment for Defendants and terminate this case and the case with which it is consolidated (No. C11-1819RAJ).

DATED this 3rd day of October, 2012.

*[signature: Richard A. Jones]*

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 10