THE HONORABLE RICHARD A. JONES

1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON
8                  AT SEATTLE

9  ALASKA VILLAGE ELECTRIC            IN ADMIRALTY AND AT LAW
   COOPERATIVE, INC., an Alaska
10 corporation,                       Lead Case No. 2:11-cv-01375-RAJ

11          Plaintiff,                Member Case No. 2:11-cv-01819-RAJ

12     v.                             DECLARATION OF DAVID R. EBEL IN
                                      SUPPORT OF MOTION TO COMPEL
13 ZURICH AMERICAN INSURANCE          AND TO EXCLUDE EXPERT
   COMPANY, a New York corporation;   TESTIMONY
14 NATIONAL UNION FIRE INSURANCE
   COMPANY OF PITTSBURGH, PA,         **NOTE ON MOTION CALENDAR:**
15 THROUGH CHARTIS GLOBAL MARINE,     **AUGUST 1, 2014**
   a Pennsylvania corporation; NATIONAL
16 CASUALTY COMPANY, a Wisconsin
   corporation; GREAT AMERICAN
17 INSURANCE COMPANY OF NEW YORK,
   a New York corporation; and STARR
18 INDEMNITY & LIABILITY COMPANY, a
   Texas corporation,
19
            Defendants.
20

21

22     I, David R. Ebel, hereby declare:

23     1.    I am an attorney of record for Defendants Zurich American Insurance

24 Company, National Union Fire Insurance Co., National Casualty Co., Great American

25 Insurance Company of New York, and Starr Indemnity & Liability Line (collectively

26 "Defendants"). I am over the age of eighteen and competent to testify. I make this

DECLARATION OF DAVID R. EBEL              SCHWABE, WILLIAMSON & WYATT, P.C.
Lead Case No. 2:11-cv-01375-RAJ - 1                    Attorneys at Law
                                                       U.S. Bank Centre
                                                  1420 5th Avenue, Suite 3400
                                                    Seattle, WA  98101-4010
                                          Telephone 206.622.1711  Fax 206.292.0460

PDX\111581\182524\CBN\14168258.1

1   declaration in support of Defendants' Motion to Compel and to Exclude Expert Testimony. I

2   make this declaration based on my personal knowledge, and my review of the file and

3   pleadings in this matter.

4         2.     Attached as Exhibit A is a true and correct copy of AVEC's Expert Disclosure

5   Under F.R.C.P. 26.

6         3.     Attached as Exhibit B is a true and correct copy of the Declaration of Linda

7   Windham in Support of Reply on Motion for Summary Judgment (Dkt. 38).

8         4.     Attached as Exhibit C is a true and correct copy of the Declaration of John

9   Weber in Support of Reply on Motion for Summary Judgment (Dkt. 37).

10        5.     Attached as Exhibit D is a true and correct copy of relevant excerpts from the

11  Deposition of Chris Bader.

12        6.     Attached as Exhibit E is a true and correct copy of relevant excerpts from the

13  Deposition of James Bauer.

14        7.     On July 10, 2014, my colleague Dan Knox conferred telephonically with

15  Michael Gossler, counsel for Plaintiff, regarding this motion. We were unable to reach

16  resolve the dispute.

17        *Under penalty of perjury of the laws of the state of Washington, I certify that the*

18  *foregoing is true and correct to the best of my knowledge.*

19        Executed in Seattle, Washington. Dated this ⎹⎺⎹ day of July, 2014

20

21        David R. Ebel

22

23

24

25

26

DECLARATION OF DAVID R. EBEL
Lead Case No. 2:11-cv-01375-RAJ - 2

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
U.S. Bank Centre
1420 5th Avenue, Suite 3400
Seattle, WA  98101-4010
Telephone 206.622.1711  Fax 206.292.0460

PDX\111581\182524\CBN\14168258.1

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on the 17th day of July, 2014, I caused to be served the foregoing

3   DECLARATION OF DAVID R. EBEL IN SUPPORT OF MOTION TO COMPEL AND

4   TO EXCLUDE EXPERT TESTIMONY on the following parties via United States District

5   Court – Western District of Washington's Electronic Case Filing System ("ECF") at the

6   following addresses:

7   - **Claire L Rootjes**
      crootjes@schwabe.com,mawilliams@schwabe.com,centraldocket@schwabe.com

8   - **Evan T Caffrey**
      ecaffrey@hallmaineslugrin.com

9   - **Andrew R Chisholm**
      achisholm@mpba.com,eservice@mpba.com

10  - **Christopher Ogilvie Davis**
      codavis@bakerdonelson.com

11  - **David Ryan Ebel**
      debel@schwabe.com,btaylor@schwabe.com,docket@schwabe.com

12  - **Michael E Gossler**
      mgossler@mpba.com,eservice@mpba.com

13  - **Bert W. Markovich**
      bmarkovich@schwabe.com,rsherwood@schwabe.com,centraldocket@schwabe.com

14  - **Jonathan Robert Moore**
      jmoore@mpba.com,eservice@mpba.com

15

16                                     SCHWABE, WILLIAMSON & WYATT, P.C.

17

18                     By:    /s/ Claire L. Rootjes
19                            Bert W. Markovich, OSB #841211
                              David R. Ebel, WSBA #28853
20                            Claire L. Rootjes, WSBA #42178
                              Attorneys for Defendants
21                            Zurich American Insurance Company,
                              National Union Fire Insurance Company
22                            of Pittsburgh, PA, through Chartis
                              Global Marine, National Casualty
23                            Company, Great American Insurance
                              Company of New York, and Starr
24                            Indemnity & Liability Company

25

26

CERTIFICATE OF SERVICE - 1
Case No. 2:11-cv-01375-RAJ

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
U.S. Bank Centre
1420 5th Avenue, Suite 3400
Seattle, WA  98101-4010
Telephone 206.622.1711  Fax 206.292.0460

PDX\111581\182524\CBN\14168258.1

# EXHIBIT A

HONORABLE RICHARD A. JONES

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| ALASKA VILLAGE ELECTRIC COOPERATIVE, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, et al., <br><br> Defendants. | Lead Case No. 2:11-cv-01375-RAJ <br><br> and <br><br> Member Case No. 2:11-cv-01819-RAJ <br><br> AVEC's EXPERT DISCLOSURE UNDER F.R.C.P. 26(a)(2)(c) |

Pursuant to F.R.C.P. 26(a)(2)(c), Plaintiff Alaska Village Electric Cooperative, Inc. ("AVEC") hereby discloses James H. Bauer as a witness at trial who may offer expert testimony based upon his expertise in the field of marine insurance, including builder's risk policies, as part of his testimony as a fact witness in this case.   Mr. Bauer will testify to the subject matter addressed in his Declaration and Supplemental Declaration on file in this case, copies of which are attached hereto as Exhibits A and B, respectively.   Mr. Bauer testified to his credentials at his deposition in this case on May 22, 2014.

{00745167-1}
AVEC's EXPERT DISCLOSURE UNDER F.R.C.P.
26(a)(2)(c) - 1

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WASHINGTON 98104-7096
(206) 682-7090; FACSIMILE (206) 625-9534

1    AVEC reserves the right to and may disclose any rebuttal witness within thirty

2  days after receipt of Defendants' disclosure, pursuant to F.R.C.P. 26(a)(2)(D).

3    DATED this __1st__ day of July, 2014.

4                              MONTGOMERY PURDUE BLANKINSHIP
                              & AUSTIN PLLC
5

6                              By: _____
7                                  Michael E. Gossler
                                  WA State Bar No. 11044
8                                  Attorneys for AVEC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 COLUMBIA CENTER
701 FIFTH AVENUE
SEATTLE, WASHINGTON 98104-7096
(206) 682-7090; FACSIMILE (206) 625-9534

# EXHIBIT A

The Honorable Richard A. Jones

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| ALASKA VILLAGE ELECTRIC COOPERATIVE, INC., | Lead Case No. 2:11-cv-01375-RAJ |
| Plaintiff, | and |
| | Member Case No. 2:11-cv-01819-RAJ |
| v. | DECLARATION OF JAMES H. BAUER |
| ZURICH AMERICAN INSURANCE COMPANY, et al., | NOTE ON MOTION CALENDAR: |
| Defendants. | February 17, 2012 (Motion) |
| | March 9, 2012 (Cross-Motion) |

James H. Bauer declares and states:

1.   I am a citizen of the United States, am over the age of 18 years, have personal knowledge of all matters stated in this affidavit, and am competent to testify to the same. I am an attorney that practices in Seattle, Washington, and I am a partner of Bauer Moynihan & Johnson LLP, which maintains its offices in Seattle, Washington.

{00255905-1} DECLARATION OF JAMES H. BAUER
- 1
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

Case 2:11-cv-01375-RAJ   Document 32   Filed 02/13/12   Page 2 of 33

2.   I was admitted to practice law in the state of Washington on October 25, 1974, and have practiced law in Seattle, Washington, continuously since my admission.  My practice always has been in the field of maritime law, and always has included maritime contracting, vessel construction, and maritime insurance of all types.  I am familiar with the forms utilized within the industry for builder's risk insurance covering the construction of vessels, and with the history of the changes to the forms.  Bauer Moynihan & Johnson LLP represents clients in all phases of vessel construction, including shipyards, owners, and insurers.

3.   In May, 2010, I was engaged by Microgen Technologies, Inc. ("Microgen") to assist Microgen with the preparation of a vessel construction agreement for the construction of two articulated tug/barge units by Sneed Shipbuilding, Inc. ("Sneed").  I proposed our firm's template Standard Vessel Construction Agreement.  As described herein, that agreement form, which includes an insurance provision requiring insurance coverage for faulty workmanship and faulty production procedures under a builder's risk policy, was discussed and negotiated between Microgen and Sneed and their respective marine insurance brokers in Seattle, Washington.

4.   The negotiation of the particulars of the vessel construction agreement utilized by Microgen and Sneed for the construction of the proposed vessels occurred in Seattle at my offices on June 10, 2010.  Mark Smith, of Vitus Marine, LLC[1], represented Microgen in the negotiations, and Mitchell Jones from Sneed represented Sneed.  They negotiated in one of our firm's conference rooms and I attended and assisted as requested.

---

[1] Vitus Marine, LLC is the company hired by Microgen to be its agent and construction manager of the vessels, and to otherwise be the owner representative.

{00255905-1} DECLARATION OF JAMES H. BAUER - 2
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5800 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

5.    During the course of the negotiation of the vessel construction agreement at my firm, both Mark Smith and Mitchell Jones had questions regarding the insurance provisions of our Standard Vessel Construction Agreement.   That form requires the builder to provide builder's risk insurance on the vessels being constructed, such insurance being for the explicit benefit of both the builder and owner.

6.    The configuration of the builder's risk insurance required by our form Vessel Construction Agreement requires the standard American Institute Builders Risk Clauses (1979) with Addenda Nos. 1 and 2, but with Addendum No. 2 then specifically deleted.  I gave Mr. Smith and Mr. Jones a copy of Addendum No. 2 from my files, a copy of which is attached hereto as Exhibit A.  They asked me to explain the purpose of deleting Addendum No. 2, which I did in the same fashion with which I have discussed that configuration of the builder's risk policy with owners, builders, brokers and underwriters since the 1980s.  Specifically, I explained the history of the basic marine builder's risk insuring forms from the '73 form to the '79 form, and the addition thereafter by U.S. marine underwriters of Addendum No. 2.  Addendum No. 2 was added to the standard builder's risk policy in the 1980's to recognize that coverage existed under the basic '79 form for faulty workmanship and faulty production procedures, and to foreclose such claims by specifically excluding coverage therefore through Addendum No. 2.  I further explained that since the mid-80s, the vessel construction agreements I have drafted require the deletion of Addendum No. 2 (elimination of the exclusions that would otherwise limit the broad scope of the all risk coverage) to re-obtain coverage for faulty workmanship and faulty production procedures, coverage which I believe is essential to fulfill the overriding purpose of builder's risk insurance, to facilitate and backstop the construction of the vessel. I told them that this coverage was readily available in the London insuring market and I also explained to both of them that the '79 clauses with

{00255905-1} DECLARATION OF JAMES H. BAUER
- 3
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7050 TEL
(206) 625-9534 FAX

ER119

Page  –  10

1  Addendum No. 2 excluded was beneficial to both owners and builders, as it provides
2  both with protection against loss in the event of negligence by any insured, including
3  Sneed, and both Mr. Smith and Mr. Jones acknowledged to me that they understood
4  and agreed with this approach of excluding Addendum No. 2 so that coverage would
5  exist for faulty workmanship and faulty production procedure.

6      7.    I explained to Mr. Smith and Mr. Jones that the American Institute of Marine
7  Underwriters and the American Hull Insurance Syndicate, the two largest and
8  dominant trade organizations representing U.S. marine underwriters, had adopted
9  the same form at approximately the same time, both expressly recognizing that
10  coverage existed for faulty workmanship/production procedures and intending to
11  foreclose such claims by specifically excluding them in Addendum No. 2, which
12  addendum was to thereafter become a standard part of the builder's risk policy.
13  Hence, there are two versions of the same form from the two dominant trade groups,
14  differing only in format but not in wording.

15      8.    At the Seattle meeting, Mr. Smith and Mr. Jones both told me they wanted
16  Addendum No. 2, specifically the exclusions for faulty workmanship and faulty
17  production procedures, deleted from the builder's risk insurance applicable to the
18  construction of the two articulated tugs and barges.  Mitchell Jones informed Mark
19  Smith and me that Sneed's builder's risk insurance program contained Addendum
20  No. 2, and that his broker indicated that the Texas marine insurance marketplace
21  was unwilling to offer the broader builder's risk insurance with Addendum No. 2
22  deleted, or, if offered, the cost would be exorbitant. Mitchell Jones was using his cell
23  phone to communicate with his broker, he handed the cell phone to me and I spoke
24  directly with his broker and confirmed these statements directly.

25      9.    At that point in the Seattle meeting, Mark Smith suggested to Mr. Jones and
26  me that he contact his Seattle marine insurance broker, Chris Bader with FIS

{00255905-1} DECLARATION OF JAMES H. BAUER
- 4
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5900 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

Case 2:11-cv-01375-RAJ   Document 32   Filed 02/13/12   Page 5 of 33

1  Marine/Arthur J. Gallagher RMS, Inc. to solicit the desired insurance from the Seattle

2  marine insurance marketplace.  Mr. Smith handed me his cellular phone, with Mr.

3  Bader on the speaker phone, and we discussed directly with Mr. Bader the

4  configuration of the insurance, the need to delete Addendum No. 2 to obtain

5  coverage for faulty workmanship and faulty production procedures, and the vessel

6  construction agreement context.  Mr. Bader indicated that he felt builder's risk

7  insurance without Addendum No. 2 could be obtained, but he was not sure whether

8  there would be a premium surcharge.

9     10.  Over the course of the next few weeks, Mr. Bader undertook to solicit the

10  Seattle marine insurance marketplace for the desired configuration of builder's risk

11  insurance.  I e-mailed to him a copy of the vessel construction agreement that was

12  signed on June 10, 2010 in the Seattle meeting, so he could present it to

13  underwriters, a copy of which is attached hereto as Exhibit B.  In that same time

14  period, I recall a couple of interested underwriters, writing in the Seattle marine

15  insurance marketplace (and with whom I had existing relationships), called me to

16  discuss the builder's risk insurance for this project, and specifically the desire to omit

17  Addendum No. 2.  I recall one of those interested underwriters as being Linda

18  Windham of National Casualty/International Specialty, Inc., one of the co-

19  underwriters and subscribers on the Policy issued in favor of Microgen, Vitus and

20  Sneed.  My explanation to Ms. Windham was the same explanation that I provided to

21  Mark Smith and Mitchell Jones at the Seattle meeting, and included a discussion that

22  the two most common risks of shipbuilding, faulty workmanship and faulty vessel

23  construction, are excluded under Addendum No. 2, and that with Addendum No. 2 as

24  part a builder's risk policy, very little coverage is being provided, whereas the point of

25  insurance is to provide coverage for ordinary and routine risks.  I further discussed

26  with her that the essence of the business of insurance is insuring against the

{00255905-1} DECLARATION OF JAMES H. BAUER
- 5
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

1   negligence of their own insureds, and that what is important is to assess the
2   significance of these risks in the specific context and set an appropriate rate.
3       11.  I was informed by Mark Smith that Chris Bader was successful in obtaining
4   the desired configuration of builder's risk insurance from the Seattle marine insurance
5   marketplace, and that a policy of builder's risk insurance with Addendum No. 2
6   deleted had been issued, insuring Sneed and Microgen for the construction of the
7   two articulated tugs and barges.  As such, the policy was both negotiated and issued
8   in Seattle.
9       12.  Thereafter, I did not hear further of the vessel construction project until May
10  2011, at which point I was informed that delivery would be delayed because of faulty
11  workmanship and faulty production procedures associated with certain welds.
12  Immediately after being so informed, I called Mr. Bader to request that he submit a
13  claim to the policy underwriters, as that was precisely what Vitus, Microgen and
14  Sneed expected to be covered by negotiating the deletion of Addendum No. 2.
15      I declare under penalty of perjury under the laws of the State of Washington that
16  the foregoing is true and correct.
17      DATED this  12  day of February, 2012, at Seattle, Washington.
18
19                                               James H. Bauer
20
21
22
23
24
25
26

{00255905-1} DECLARATION OF JAMES H. BAUER
- 6
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5400 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA. 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

# EXHIBIT A

ER123

### AMERICAN HULL INSURANCE SYNDICATE
### ADDENDUM NO. 2 TO THE
### AMERICAN INSTITUTE BUILDER'S RISK CLAUSES
(February 8, 1979)

HULL RISKS

Lines 61-62 of the attached policy are hereby deleted and the following substituted therefore:

Subject to the provisions of exclusion (b) of the following paragraph, in the event that faulty design of any part or parts should cause physical loss of or damage to the Vessel, this insurance shall not cover the cost or expense of repairing, replacing or renewing such part or parts, nor any expenditure incurred by reason of betterment or alteration in the design. Faulty design shall include, but not be limited to, errors, omissions or deficiencies in plans, drawings, specifications or calculations.

Further, Underwriters shall not pay for any loss, damage or expense caused by or arising in consequence of:

(a) Faulty workmanship, or the installation or use of improper or defective materials, unless resulting in destruction, deformation, breaking, tearing, bursting, holing or cracking of the Vessel, or any other like condition, and which loss, damage or expense in not otherwise excluded under the terms and conditions of the War, Strikes and Other Exclusions Clause of the attached Policy; provided that Underwriters in no event shall respond for the cost or expense of repairing, replacing or renewing any improper or defective materials:

(b) Faulty production or assembly procedures, even if constituting faulty design.

SUBROGATION

The following provision is added after line 205 of the attached policy:

In case of any agreement or act, past or future, by the Assured whereby any right of recovery of the Assured against any person or entity is released or lost to which these Underwriters on payment of loss would be entitled to subrogation but for such agreement or act, this insurance shall be vitiated to the extent that the right of subrogation of these Underwriters has been impaired thereby; and in such event the right of these Underwriters to retain or collect any premium paid or due hereunder shall not be affected.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

ER124

### AMERICAN HULL INSURANCE SYNDICATE
ADDENDUM NO. 2 TO THE
AMERICAN INSTITUTE BUILDER'S RISKS CLAUSES
(MAY 15, 1985)

To be attached to and form a part of Policy
(hereinafter "the Underwriters")

**ASSURED**

This policy insures

_____                    hereafter referred to as the Assured.
_____

**HULL RISKS**

Lines 61-62 of the Attached Policy are hereby deleted and the following substituted therefor:

Subject to the provisions of exclusion (B) of the following paragraph, in the event that faulty design of any part or parts should cause physical loss
of or damage to the Vessel this insurance shall not cover the cost or expense of repairing, replacing or renewing such part or parts, nor any
expenditure incurred by reason of a betterment or alteration in the design. Faulty design shall include, but not be limited to, errors, omissions
or deficiencies in plans, drawings, specifications or calculations.

Further, Underwriters shall not pay for any loss, damage or expense caused by or arising in consequence of: Faulty workmanship, or the installation or use of
improper or defective materials, unless resulting in destruction.

    (A)   deformation, bruising, bearing, bending, holing or cracking of the Vessel, or any other like  conditions, and which loss,
             damage or expense is not otherwise excluded under the terms and conditions of the War, Strikes and Other Exclusions
             clause of the attached Policy; provided that Underwriters in no event shall respond for the cost or expense
             of repairing, replacing or renewing any improper or defective materials;

    (B)   Faulty production or assembly procedures even if constituting faulty design.

**SUBROGATION**

The following provision is added after line 205 of the attached Policy:

    In case of any agreement or act, past or future, by the Assured whereby any right of recovery of the Assured
    against any person or entity is released or lost to which these Underwriters on payment of loss would be entitled
    to subrogation but for such agreement or act, this insurance shall be vitiated to the extent that the right
    of subrogation of these Underwriters has been impaired thereby; and in such event that right of these
    Underwriters to retain or collect any premium paid or due hereunder shall not be affected.

All other terms and conditions remain unchanged.

ER125

# EXHIBIT B

ER126

# STANDARD VESSEL CONSTRUCTION AGREEMENT

Microgen Technologies, Inc. as Owner and Sneed Shipbuilding, Inc. as Builder, for valuable consideration the receipt and sufficiency of which is irrevocably acknowledged, agree as follows:

**1.   BASIC AGREEMENT**

Builder agrees to construct, launch, test and deliver to Owner, and Owner agrees to purchase from Builder, the Vessels more particularly described hereinafter but generally described as follows (the "Vessels", "Tugs" and/or "Barges", as applicable):

> Two (2) 77' x 32' triple screw tugs, one (1) 175' x 50' x 9' deck/tank barge, and one (1) 200' x 50' x 9' deck/tank barge.

The Vessels shall be constructed by Builder in accordance with the technical specification identified below, with Builder to provide such additional plans, drawings and technical services identified therein as well as all labor, materials, tools, equipment, facilities, parts, fabrications, gear and outfitting necessary to construct, launch, test and deliver the Vessels in accordance with the technical specification and otherwise pursuant to the terms and conditions of this agreement.

**2.   TECHNICAL SPECIFICATION**

The technical specification for the Vessels shall consist of the specifications, contract plans and contract guidance plans attached hereto as Exhibit A, deemed fully incorporated herein. The technical specification has been prepared by Jensen Maritime Consultants, Inc. at the request and expense of Owner, and is being provided herein by Owner. The purpose of the technical specification is generally to identify the Vessels as they are to be constructed and delivered to Owner by Builder. The technical specification does not include additional plans, drawings and technical services not identified therein but which shall be required for the completion of construction and delivery of the Vessels. Those additional plans, drawings and technical services, including final 'as built' drawings, shall be provided by Builder as part of the purchase price.

It is the responsibility of Builder to integrate the various components of the technical specification such as to assure proper fit and operation and to avoid any interference or conflict. Builder shall follow all details and dimensions shown on the technical specification and shall verify all dimensions and details to eliminate any interference and tightly and properly fit all parts.

In the event Builder believes there is any defect or deficiency in the technical specification, an inability to continue or complete construction because of the technical specification, and/or Builder believes it is not possible to assure proper fit and operation or avoid interference or conflict pursuant to the technical specification, Builder shall identify such problem immediately to Owner's representative verbally, and, if the problem is not resolved directly with Owner's representative within 48 hours of such verbal notification, in writing to Owner's representative.

Any technical specification dispute between Owner and Builder which cannot be resolved by the parties within 48 hours of written notice from Builder shall be resolved pursuant to the dispute resolution procedure set forth in section 26, below. Any change or correction to the technical specification shall be at Owner's expense. Should any change or correction to the technical specification result in delay, increased/decreased labor, and/or increased/decreased materials, the parties shall execute a change order pursuant to section 8, below, and such change order shall, as applicable, extend the construction

VESSEL CONSTRUCTION AGREEMENT                                                                 PAGE 1

AVEC000011

ER127

schedule and delivery date and increase/decrease the purchase price; in the event dispute resolution is utilized, the decision of the arbitrator shall, as applicable, be confirmed as a change order.

In the event of conflict between the technical specification and the terms and conditions of this agreement, the latter shall control, but only to the extent of such conflict and no further.

3.    OWNER'S SUPPLY

Owner shall not be responsible for supplying any parts, materials or components identified in the technical specification. Items which are not identified in the technical specification or which Owner intends to supply which are separate from the technical specification, whether during construction or subsequently, shall be identified and supplied by Owner to Builder at least sixty (60) days in advance of when the relevant system or component is to be manufactured, assembled and/or installed, so as to allow Builder to take such items into consideration during construction. To the extent Owner wishes to engage Builder to manufacture, assemble or install any portion of Owner's supply, Owner and Builder shall negotiate and execute a change order pursuant to section 8, below, adjusting the purchase price, construction schedule and/or completion date. Any additional outfitting of the Vessels requested by Owner of Builder beyond the technical specification shall be considered Owner's supply. As of the date of execution of this agreement, Owner intends to supply the items identified on Exhibit D attached hereto.

4.    DOCUMENTATION AND CLASSIFICATION

The Vessels shall be delivered to Owner with the following documentation in the name of Owner, all of which shall be deemed included within the purchase price:

    A.    USCG Certificates of Documentation for all Vessels;
    B.    USCG Certificates of Inspection as Subchapter D, Grade B and lower flammable liquid bulk product and deck cargoes barges for inland waters for the Barges; and,
    C.    ABS Load Line Certificates (unmanned and ocean service) and USCG Stability Letters for the Barges.

In addition and upon Owner's request, Builder shall establish a documentation file with the U.S. Coast Guard to assist Owner's lender, if any, with recordation of a preferred ship mortgage or other security instruments. The cost of establishing such documentation file shall be for Builder's account, but the costs associated with the recordation of any preferred ship mortgage or other security instrument shall be for Owner's account.

Any change in the foregoing regulatory requirements occurring or promulgated after the execution of this agreement, but before Owner accepts delivery of the Vessel, shall be deemed included within the foregoing requirements and shall be made, performed and/or provided by Builder at the expense of Owner. Builder shall promptly inform Owner of any such change and shall prepare an agreed change order for counter-signature by Owner, such change order shall adjust the purchase price and completion date as set forth therein.

The foregoing shall be in addition to the technical specification and shall be performed and/or provided by Builder at Builder's expense and deemed included within the purchase price.

5.    PURCHASE PRICE

The purchase price for the construction of the Vessels shall be USD Eight Million One Hundred and Twenty Five Thousand ($8,125,000). The purchase price may be adjusted only through a change order signed by both parties as set forth in section 8, below.

VESSEL CONSTRUCTION AGREEMENT

PAGE 2

AVEC000012

ER128

6.   PAYMENT AND RELATED PROVISIONS

A.   Deposit.  Owner shall pay a deposit of USD One Million ($1,000,000) concurrently with the execution of this agreement, with such deposit to be a credit against the purchase price.

B.   Progress Payments.  In addition to the foregoing deposit, Owner shall make progress payments as set forth on Exhibit E, hereto.  Builder shall provide Owner's representative with a written notice certifying that each milestone in the progress payments has been reached, at which point Owner's representative shall inspect to determine whether the milestone has been reached.  Owner shall pay Builder the relevant progress payment within five (5) business days of Builder's certification.  In the event there is a dispute as to whether a milestone has been reached, the parties shall resolve such dispute promptly pursuant to the dispute resolution procedures set forth in 26, below.  Such progress payments shall be a credit against the purchase price.

C.   Retainage.  Five percent (5%) of each of the foregoing deposit and progress payments identified above shall be retained by Owner and concurrently deposited into an interest bearing account in a national bank established by Owner and identified to Builder for the purpose of securing Builder's performance under this agreement, including but not limited to warranty claims identified in Section 12, below.  The full amount of the retainage plus any accrued interest shall be paid to Builder six (6) months following final delivery and acceptance of the Vessels pursuant to Section 20, below, said sum to be adjusted based upon any warranty claims otherwise unresolved at the date scheduled for disbursement.  Notwithstanding the foregoing, Owner shall be entitled to utilize the retainage to offset any other sums which may be due Owner from Builder pursuant to this agreement as of the date scheduled for disbursement.

D.   Security Interest.  As security for Builder's obligations under this agreement, Builder hereby grants to Owner and Owner's lender, if any, a first position mortgage, lien and continuing security interest in and to all of Builder's present and future right, title and interest in and to the whole of the Vessels and all equipment, materials, parts, fabrications, gear and outfitting to be incorporated into and/or relating to the Vessels including Builder's inventory pertaining thereto, whether now owned or hereafter acquired together with the proceeds thereof, which first position mortgage, lien and security interest shall continue until delivery and acceptance of the Vessels pursuant to Section 20, herein.

E.   Payment Instructions.  Builder shall provide Owner with payment instructions, including wire transfer instructions if applicable, with each certification.

F.   Charges.  As this agreement is on a turnkey basis, there shall be no additional charges for Owner's account other than as expressly provided for in this agreement.  All charges applicable to the construction, launching, testing and delivery of the Vessels shall be deemed included in the purchase price.

G.   Taxes.  Builder shall be responsible for any sales or other tax assessed with respect to the construction, sale and delivery of the Vessels to Owner.  All business and occupation, income and similar taxes shall be Builder's responsibility and deemed included within the purchase price.

H.   Interest.  Sums which are due pursuant to this agreement but which have not been paid shall accrue interest at the rate of one percent (1%) per month from date due until paid in

VESSEL CONSTRUCTION AGREEMENT                                                    PAGE 9

AVEC000013

ER129

full.

**7.   CONSTRUCTION SCHEDULE**

A.   <u>Commencement Date.</u> The construction of the Vessels shall commence immediately following execution of this agreement and tender of the deposit identified in subsection 6.A, above.

B.   <u>Construction Schedule.</u> Builder shall provide a comprehensive construction schedule to Owner within fourteen (14) days following execution of this agreement. The construction schedule shall be upon a graphic format and shall project in detail the construction of the Vessels on a weekly basis, identifying labor tasks and fabrications. The construction schedule shall also demonstrate stages for specific work items, i.e., major areas and components. The construction schedule shall be updated monthly and provided to Owner, at which point such updated construction schedule shall replace any prior versions thereof.

C.   <u>Progress Reports.</u> In addition to the construction schedule, Builder shall provide Owner with written monthly progress reports, labor summaries and purchase summaries.

D.   <u>Tests and Trials.</u> The Vessels shall be ready for sea trials and tests two (2) weeks before the completion date, unless otherwise excused pursuant to this agreement, including through an executed change order.

E.   <u>Completion Date.</u> The construction of the Vessels is to be completed, including completion of all tests and trials as well as delivery to Owner, on or before April 1, 2011, unless otherwise excused pursuant to this agreement, including through an executed change order.

**8.   CHANGE ORDERS**

The technical specification, purchase price, construction schedule and completion date shall not be altered or amended except through a written change order executed by both parties as set forth in this section. All change orders shall be upon the form attached as Exhibit B hereto, which form is deemed fully incorporated into this agreement.

Owner may alter or amend the technical specification by presenting Builder with a written request for change order. The written request for change order shall identify the requested change with particularity and estimate the effect which the requested change should have upon the purchase price, construction schedule and/or completion date.

Within three (3) working days following Builder's receipt of Owner's written request for change order, Builder shall prepare, execute and submit to Owner a change order upon the form attached as Exhibit B hereto. The change order shall describe the change with particularity, all costs and expenses necessary to manifest the change and the effect which the change will have upon the purchase price, construction schedule and/or completion date; the change order shall identify any savings in material and labor as well as any increases thereof.

VESSEL CONSTRUCTION AGREEMENT                                                                PAGE 4

AVEC000014

ER130

Within three (3) working days of Owner's receipt of the change order, Owner shall either accept and countersign the change order or respond with an alternate proposal. If Owner wishes to proceed with the change but the parties have not agreed as to the effect thereof, such dispute shall be immediately resolved pursuant to section 26, below. If a disputed change order, including any arbitration thereof, should cause a delay in the construction schedule, the construction schedule (including the completion date) shall be deemed automatically extended for that period of time. Following resolution of the disputed change order, a new change order shall be executed by both parties and work shall proceed.

Should Builder elect to alter or amend any part of the technical specification without a direct request from Owner, whether by reason of error, improper fit, impracticality, conflict within the technical specification or otherwise, such alteration or adjustment must be approved by Owner through a change order signed by both parties as set forth above, but such change shall not increase the purchase price or alter the construction schedule or completion date unless so agreed by Owner in writing.

**9.      OWNER'S REPRESENTATIVE**

Owner has appointed Vitus Marine, Inc. as its representative with respect to the construction of the Vessels and this agreement. Owner's representative is authorized to act on behalf of Owner (including, without limitation, execution of a change order). Owner shall be responsible for all fees, costs and expenses with respect to its representative.

During the term of this agreement, Builder shall provide Owner with two parking spaces for vehicles near Builder's main office and yard, as well as with sufficient office space to accommodate two persons. The office space shall include a desk, chairs, telephone, access to a computer, copy and facsimile machines, internet connection and filing cabinets. Long distance telephone and facsimile charges incurred by Owner shall be reimbursed by Owner on a monthly basis, with Builder to assume all other expenses relative to the accommodations provided to Owner. Owner's representative shall be entitled to use such accommodations.

**10.     OWNER'S RIGHT TO ACCESS AND INSPECTION**

Owner, including its aforesaid representative, shall have full and unrestricted access to the work site and the Vessels during Builder's regular business hours while accompanied by a project manager or other representative of Builder. Owner shall be entitled to inspect the Vessels and all materials, parts, fabrications, gear and outfitting relating to the Vessels during normal business hours during construction and until acceptance of the Vessels by Owner as set forth in this agreement. No inspection by Owner and/or its representative, including any comments or recommendations, shall waive or decrease Builder's obligations and responsibilities under this agreement nor increase Owner's responsibilities under this agreement, but Owner shall promptly notify Builder of any defect, deficiency or deviation from this agreement, including the technical specification, of which it becomes aware during any such inspection.

**11.     PROTECTION OF VESSELS**

Builder shall be responsible for the protection of all materials, parts, fabrications, gear and outfitting applicable to the Vessels from exposure to the elements, damage and deterioration and shall do the same for the modules and the Vessels during the course of construction consistent with good commercial shipbuilding practice. Builder shall assure that the Vessels and all materials, parts, fabrications, gear and outfitting applicable to the Vessels are kept clean and free of construction debris on a regular basis.

VESSEL CONSTRUCTION AGREEMENT                                                          PAGE 5

AVEC000015

**12.    BUILDER'S WARRANTIES**

A.    Builder's Warranties.  Builder expressly warrants that upon completion of construction of the Vessels and delivery to Owner:

    (1).    The Vessels shall have been constructed in full accordance with the technical specification as well as the terms and conditions of this agreement, subject only to any adjustment(s) thereof pursuant to change order(s) executed by both parties as set forth in section 8, above.

    (2).    All materials, components, parts and equipment incorporated into the Vessels shall be new, and all workmanship shall be of good commercial quality and otherwise consistent with good construction practice for similar vessels.

    (3).    The Vessels shall be free from defects in materials, parts and equipment, as well as free from defects in workmanship.

    (4).    All materials, parts and equipment purchased for installation on the Vessels which were manufactured by others (but not to include parts or equipment fabricated by Builder's subcontractors) shall be warranted to Owner to the extent of the respective manufacturer's warranty(ies), which warranty(ies) shall be assigned or transferred to Owner, but with Builder warranting the good quality workmanship of the installation/incorporation of such materials, parts and equipment.

    (5).    As to Owner's supply, Builder warrants only the good commercial quality workmanship of the installation/incorporation of such materials, parts and equipment.

B.    Waiver of Further Warranties.  The warranties contained in subsection A, above, and the other obligations and responsibilities of Builder set forth in this agreement, are the only warranties made by Builder as to the Vessels. Builder makes no other warranties, express or implied, including, without limitation, any other warranty of fitness for particular purpose, merchantability or workmanlike service, whether through course of dealing, usage, trade or otherwise. The aforesaid warranties of Builder are in lieu of all other warranties, guarantees, conditions or liabilities, whether express or implied and whether arising by law or otherwise, including, without limitation, under the Uniform Commercial Code.

C.    Warranty Claims and Limitations.

    (1).    The time period applicable to the aforesaid warranties of Builder shall be twelve (12) months following the delivery of the Vessels to and acceptance of the Vessels by Owner.

    (2).    The aforesaid warranties of Builder are specifically conditioned upon Owner operating and maintaining the Vessels with due care, and Builder shall not be responsible for loss or damage resulting from Owner's negligence, separate acts of third parties or normal wear and tear upon the Vessels.

    (3).    Builder shall be notified promptly, and no later than thirty (30) days following discovery by Owner, of any breach of warranty claim, and Builder shall be allowed, at its expense, to inspect the Vessels prior to any repair or destruction of

VESSEL CONSTRUCTION AGREEMENT                                                            PAGE 6

AVEC000016

ER132

relevant parts, though Builder must conduct such inspection within seven (7) days of Owner's notice, unless emergency circumstances require that such inspection occur sooner.

(4).   Builder shall, at its expense, repair or replace items for which Builder is in breach under this agreement, at the location of usual operation for such Vessel, promptly and at a date and time agreed between Owner and Builder. In emergency circumstances for which it is not safe or practical for Owner to defer repairs or await Builder's inspection (but Owner otherwise having given Builder prompt notice), Builder shall be responsible for the costs of correction to the extent such would be charged by Builder to the general public.

**13.   TITLE AND RISK OF LOSS**

Owner shall acquire title to all parts, components, equipment and materials purchased for the Vessels and to all fabrications relating to the Vessels and/or its construction to the extent of payments made by Owner to Builder pursuant to this agreement.

Builder shall identify all parts, components, equipment and materials purchased for the Vessels to Owner, shall provide Owner with copies of all purchase orders and invoices upon request from Owner, shall specifically and clearly mark all such items with the name of the Vessels and the contract number upon receipt of such items at the yard, shall segregate all such items from inventories of similar items (including similar items for other projects), and shall identify, mark and segregate all fabrications for the Vessels.

Notwithstanding the foregoing, and even though Owner shall acquire title as set forth above, all risk of loss/damage and duty to insure such items shall remain solely with Builder until the Vessels have been delivered to and accepted by Owner as set forth in this agreement.

**14.   INSURANCE**

A.   Required Policies. Builder shall, at its sole expense including the expense of premiums and deductibles, procure and maintain the following policies of insurances during the full term of this agreement and until the Vessels are delivered to and accepted by Owner as set forth in this agreement;

(1).   builders risks insurance pursuant to American Institute Builders Risks Clauses (Feb. 8, 1979), excluding Addendum No. 2 (May 16, 1985), to the full purchase price of the Vessels identified in section 6, above;

(2).   standard workers compensation and employers liability insurance, extended to include coverage under the Longshore Act, with statutory limits for workers compensation and limits of $2,000,000 per single occurrence for employers liability; and,

(3).   marine and/or commercial general liability insurance, specifically endorsed to include contractual coverage for this agreement and Builder's obligations under this agreement, with limits of at least $5,000,000 per single occurrence.

B.   Insuring Conditions. The insurance policies identified above shall be subject to the following conditions, the requirement for which shall not be waived unless specifically waived through a writing signed by both parties;

(1).   All insurance policies shall be upon forms and with underwriting security

VESSEL CONSTRUCTION AGREEMENT                                         PAGE 7

AVEC000017

ER133

(2). Each insurance policy shall be specifically endorsed to provide Owner with fifteen (15) days advance written notice in the event of any cancellation or material change in insuring terms or conditions.

(3). Owner and Builder shall each be identified as insureds and co-loss payees, A.T.R.I.M.A., upon the required builders risks insurance policy, but Owner shall be identified as the sole-loss payee to the extent of the purchase price which has been paid. With respect to subsection 14.A.(1), above, Builder's responsibility for the premium procuring such insurance with Addendum No. 2 deleted shall only extend to a total cost of such insurance of $26,000 for all Vessels, with Owner to be responsible for premiums in excess of such sum. Further, Owner may elect, within fourteen (14) days of execution of this agreement, to allow Addendum No. 2 to be included on the builders risk policy, in which event the foregoing sentence shall be inapplicable.

(4). Owner and Builder shall each be identified as insureds upon the required marine and/or commercial general liability insurance policy.

(5). The required workers compensation and employers liability insurance shall be specifically endorsed to waive subrogation against Owner.

C.   Certificates of Insurance. Upon request from Owner and at any time during the construction of the Vessels and until the Vessels are delivered to and accepted by Owner as set forth in this agreement, Builder shall evidence each or all of the required insurances, including the foregoing insuring conditions, by providing Owner with certificates of insurance and/or complete copies of policies, as and to the extent requested by Owner.

D.   Failure of Insurance. Should Builder fail to procure or maintain any insurance as identified above, should an insurance fail for any reason (including, without limitation, breach of condition or warranty), or should an insurer otherwise refuse or be unable to pay, Builder shall be deemed the insurer or self-insurer therefor, shall accept and pay any claims which would have otherwise been covered by the insurance and shall indemnify and hold Owner harmless (including legal fees and costs) of and from any loss, damage, expense, claim, liability and/or suit which would have otherwise been covered by such insurance.

15.   LIABILITY AND INDEMNITY

A.   Builder. During the full term of this agreement and until delivery of the Vessels to and acceptance of the Vessels by Owner, Builder shall be solely responsible for:

(1). the protection, security and safekeeping of all parts, equipment, materials and fabrications for the Vessels and the protection, security and safekeeping of the Vessels at all stages of construction; and

(2). any loss, damage, expense, claim, liability and/or suit of any type or nature whatsoever and from any source whatsoever arising out of or relating to the Vessels or its construction, including without limitation any bodily injury, illness and/or death of any person other than employees of Owner or Owner's representative, property damage and pollution/environmental risks, except as excluded in subsection B, immediately below. Builder shall not be responsible for any loss, damage, expense, claim, liability or suit caused solely and directly by Owner.

VESSEL CONSTRUCTION AGREEMENT                                         PAGE 9

AVEC000018

B.    **Owner.** During the full term of this agreement and until delivery of the Vessels to and acceptance of the Vessels by Owner, Owner shall be responsible for bodily injury, illness and/or death of any employees of Owner or Owner's representative.

C.    **Indemnity.** Each party shall indemnify and hold the other party harmless (including legal fees and costs) from the liabilities allocated to it pursuant to this section 15; in furtherance of the foregoing indemnification agreement, each party waives any exclusivity of remedy and/or immunity from suit available pursuant to any workers compensation or similar law.

16.    SECURITY FOR PERFORMANCE

A.    Irrevocable Standby Letter of Credit. In order to secure Builder's full and faithful performance of this agreement, concurrent with execution hereof Builder shall deliver to Owner an irrevocable standby letter of credit in the amount of $1,000,000, issued by Amegy Bank N.A. ("Issuer"), and confirmed by Wells Fargo Bank N.A. ("Confirming Bank"), upon a form and with language approved by Owner ("Letter of Credit"). The cost of the Letter of Credit shall be borne by Builder. The Letter of Credit shall have a term of fourteen (14) months from its date of issuance, and shall expressly require that the Issuer provide Owner one hundred twenty (120) days written notice prior to expiration of said 14-month term. The Letter of Credit shall expressly provide that Issuer and Confirming Bank shall honor Owner's demands for payment, regardless of whether Builder disputes Owner's demand. Nothing herein shall be deemed or construed to limit Builder's liability under this agreement to the amount of the Letter of Credit, and Builder shall remain fully liable for any amounts due Owner that may exceed the amount of the Letter of Credit. Builder's delivery of the original Letter of Credit described in this section shall be a condition precedent to Owner's obligations under this agreement. Concurrently with delivery to and final acceptance of the Vessels by Owner pursuant to section 20, below, Owner shall return the original Letter of Credit to Builder.

B.    Security for Performance/Financing Statement. In addition to the foregoing security for performance, as well as the security interest granted in subsection 6.D, above, Builder agrees to obtain a Subordination Agreement from Martin M. Sneed, Sr. with respect to the security interest identified in subsection 6.D, above, as well as with respect to Drydock DD 21 (as more fully described in section 4 of the UCC-1 Financing Statement), including all proceeds thereof and all monies, income, benefits and/or products thereof or attributable or accruing thereto to secure the full and faithful performance of this agreement.

17.    LIQUIDATED DAMAGES

If delivery of the Vessels is delayed beyond the completion date identified in Subsection 7.E., above, or if Owner's acceptance of the Vessels is delayed due to delivery of the Vessels other than in full conformity with the terms and conditions of this agreement (including, without limitation, any such delay resulting from or relating to Owner's exercise of the remedy described in Section 26, below), Builder understands and agrees that Owner will suffer damages by reason of such delay the exact amount of which may not be determined with certainty; in such event, therefore, beginning at 12:01 a.m. for each calendar day that delivery is delayed beyond the tenth (10th) day after the completion date and until such time that Builder tenders delivery of the Vessels to Owner in accordance with this agreement including the technical specification, Builder shall pay to Owner as liquidated damages and not as a penalty the sum USD Seven Thousand ($7,000) per day for each day of such delay up to a maximum amount of USD Two Hundred and Ten Thousand ($210,000).

Owner's right to such liquidated damages shall be Owner's sole and exclusive remedy for damages or

VESSEL CONSTRUCTION AGREEMENT                                                      PAGE 9

AVEC000019

loss due to late delivery, including, but not limited to, lost revenues, lost income, additional project management costs, extended overhead costs and other delay or time related costs or losses due to late delivery of the Vessels, and Owner specifically waives all rights and remedies at law or equity.

**18.      FORCE MAJEURE**

Builder's obligation to perform under this agreement shall be deemed suspended in the event any one or more of the following shall operate such as to substantially impair Builder's ability to perform, so long as such inability remains beyond the reasonable control of Builder and occurs without its fault or neglect: an act of God; riot; strike; fire; flood; destruction of Builder's facility; and/or unavailability of materials (provided that Builder could not have reasonably anticipated such unavailability as of the date of execution of this agreement).

Builder shall provide Owner with written notice of any force majeure event within twenty four (24) hours of its onset, and shall thereafter use due diligence to promptly return to work.  Any time lost by operation of a force majeure event shall cause a corresponding automatic extension of the construction schedule and completion date, with the parties to manifest such extension by mutual execution of a change order.

**19.      TESTS AND TRIALS**

Builder shall, at its expense and during the course of construction and dockside prior to sea trials, conduct sufficient factory, installation and/or system tests on all parts, equipment, fabrications, gear, outfitting and systems aboard the Vessels.  Such tests shall verify the proper installation, fit and operation of every item of machinery and equipment, including without limitation electrical, electronic, navigational, hydraulic, piping, plumbing, ventilation, air conditioning, and fire detection (including control and extinguishing).  If Owner requests testing beyond the foregoing and if Builder believes such testing unnecessary, Owner shall bear the cost of replacing or repairing system parts required by the nature of such test.  Builder shall also, at its expense (including the expense of consumables) and prior to delivery, conduct sufficient sea trials of the Vessels to verify the proper stability, trim, speed and general performance of the Vessels, as applicable.  To the extent feasible, such sea trials shall include open ocean operation.  Builder shall maintain comprehensive written records of all tests and trials.

Builder shall provide Owner with reasonable advance notice of all tests and trials so that Owner and/or its representative may attend.  No attendance at tests or trials by Owner or its representative shall in any way waive or decrease Builder's responsibilities under this agreement, but Owner shall promptly notify Builder of any defect, deficiency or deviation from this agreement, including the technical specification, of which it becomes aware.

**20.      DELIVERY AND ACCEPTANCE**

The Vessels shall be delivered to Owner on or before the completion date identified in subsection 7.E, above, at Builder's facility, subject to any executed change order(s).  At the time of delivery, Owner shall inspect the Vessels to determine whether they conform to the technical specification as well as to the terms and conditions of this agreement; if the Vessels are deemed by Owner to conform to the technical specification as well as the terms and conditions of this agreement, Owner shall provide Builder with an executed Delivery Certificate on the form identified at Exhibit C, hereto, and the Vessels shall be deemed accepted by Owner.

If the Vessels are believed by Owner not to conform to the technical specification and/or the terms and conditions of this agreement, Owner shall identify on the Delivery Certificate with particularity and in writing each item or part which it believes does not conform and shall assign a dollar value and a time period required for correction of each such item or part.  Builder shall promptly thereafter either undertake to correct such item or part or shall accept Owner's assigned dollar value, as a result of the latter of which

VESSEL CONSTRUCTION AGREEMENT                                                  PAGE 10

AVEC000020

ER136

the purchase price shall be reduced by the dollar value assigned by Owner and the Vessels shall be deemed accepted by Owner.

Upon acceptance of the Vessels by Owner, Builder shall provide Owner with:

A.  an original Builders Certificate and all other documentation and classification certification, as outlined in section 4, above, relating to the construction and documentation of the Vessels;

B.  all manufacturer's brochures, installation descriptions, manuals, maintenance and repair instructions for all mechanical and electrical systems as well as all gear, equipment and outfitting manufactured by others with respect to the Vessels or its construction;

C.  clearly presented diagrams and instructions for all safety equipment, piping, wiring and other systems aboard the Vessels;

D.  specifications and schedules of paint and coatings;

E.  all specifications, plans and drawings of the Vessels, including "as built" drawings;

F.  a list of all inventories and consumables aboard the Vessels as of the date and time of acceptance by Owner;

G.  deadweight measurement and inclining test data; and,

H.  all lien releases, as referenced in section 21, below.

Other than item A, above, the foregoing shall be provided to Owner in two (2) sets, one for the Vessels and one to remain ashore for service assistance, to be bound in a three ring binder or other agreed format. To the extent utilized by Builder or otherwise available, Builder shall also provide Owner with information and documentation on a computer format, including any CAD drawings. To the extent any of the foregoing items are created or generated by Builder, Builder grants Owner a continuing license to use and reproduce such items for the operation, repair, maintenance, modification and/or rebuilding of any of the Vessels, as well as for regulatory compliance purposes.

21.   LIENS

The Vessels shall be delivered to Owner free and clear of all liens, claims, encumbrances and mortgages of any nature and howsoever arising, other than such as may have been created solely by Owner, including Owner's default in payment under this agreement. Builder shall obtain lien releases from all subcontractors, vendors and suppliers of labor, materials, equipment, parts, fabrications, gear, outfitting and components, and shall provide the originals thereof to Owner prior to delivery of the Vessels.

22.   OWNER DEFAULT

A.  Events of Default. Owner shall be in default under this agreement if any one or more of the following should occur:

(1).  Owner fails to perform any material term or condition of this agreement;

(2).  Owner fails to pay any sum when and as due under this agreement, providing that thirty (30) days has elapsed without payment;

VESSEL CONSTRUCTION AGREEMENT                                                          PAGE 11

(3).  Owner permits the Vessels (or any part thereof or any part of its interest therein) to be attached or in any manner restrained by process of any court prior to delivery to and acceptance by Owner; and/or

(4).  Owner makes an assignment for the benefit of its creditors or files, or has filed against it, any petition in bankruptcy.

B.  Remedies.  In the event of Owner default, Builder may, at its option, stop work or continue working (including completion of the Vessels); following any stoppage or completion of work, as applicable, Builder may undertake a public sale of the Vessels, with the proceeds of such sale to be distributed in the following sequence:

(1).  Builder shall be reimbursed its actual costs of sale, including legal fees and costs;

(2).  thereafter, Builder shall be reimbursed any sums which it would have earned under this agreement up until such stoppage or completion but less sums paid by Owner pursuant to this agreement;

(3).  thereafter, Owner shall be reimbursed its deposit and any progress payments which have been made; and

(4).  thereafter, any balance remaining shall be for Builder's account.

23.  BUILDER DEFAULT

A.  Builder Default.  Builder shall be in default under this agreement if any one or more of the following should occur:

(1).  Builder fails to perform any term or condition of this agreement, Owner having informed Builder of such failure and having provided Builder with seven (7) days in which to cure and with no cure having been made;

(2).  Builder falls behind the construction schedule by more than twenty (20%) of the scheduled progress or by more than forty five (45) days, whichever shall first occur;

(3).  Builder is unable to continue construction of the Vessels due to operation of a force majeure as set forth in section 18, above, and such force majeure shall have operated continuously for a period of forty five (45) days or more; and/or

(4).  Builder makes an assignment for the benefit of its creditors or files, or has filed against it, any petition in bankruptcy.

B.  Remedies.  In the event of Builder default, Owner may, at its option terminate this agreement, after which:

(1).  Builder shall have no claim whatsoever for further payment (save as provided for in this section) but shall remain liable to Owner for all loss and damage suffered by Owner by reason of the default or occurrence upon which such notice is based.

VESSEL CONSTRUCTION AGREEMENT                                        PAGE 12

AVEC000022

(2).   Builder shall deliver the Vessels to Owner as directed by Owner, along with any finished work not delivered therewith and any materials, parts, work-in-progress which Builder has acquired or produced pursuant to this agreement. Subject to deduction of any claim which Owner may have against Builder, Owner shall reimburse Builder for his reasonable costs for such materials, parts or work-in-progress so delivered. Should the progress of construction of the Vessels be so advanced that Builder is not able to remove the Vessels without launching, Owner shall be entitled to enter and utilize Builder's premises to continue work to the point of launching, providing Builder with reasonable compensation for the use of such premises.

C.   Other Remedies.  In addition to the foregoing, in the event of Builder default Owner shall have available to it all other remedies available at law, equity or otherwise.

**24.   SUBCONTRACTING**

Builder may subcontract a portion of the construction work to be performed pursuant to this agreement with Owner's consent, which consent may be given through written or e-mail format and shall not be unreasonably withheld by Owner; notwithstanding the foregoing, it is the intent and essence of this agreement that Builder remains at all times principally responsible for the construction of the Vessels and the delivery of the Vessels to Owner as set forth in this agreement, and no such subcontracting shall be deemed to relieve Builder of its responsibilities under this agreement.

**25.   ASSIGNMENT**

Other than subcontracting as identified in section 24, above, neither party may assign this agreement or any portion of its performance under this agreement without the written consent of the other party.

**26.   DISPUTE RESOLUTION**

The laws of the State of Texas shall be applicable to this agreement and performance under this agreement.

Any dispute as to the timing of progress payments, change orders (including their effect) or conformity of the Vessels to the technical specification and other terms and conditions of this agreement shall be resolved by a single arbitrator agreed to by both parties or, failing such agreement upon a single arbitrator, by a single arbitrator appointed by the court. The single arbitrator shall be a naval architect, vessel designer, marine surveyor or other person familiar with the construction of vessels similar to the Vessels.

The single arbitrator shall proceed promptly to adjudicate the decision, time being of the essence in this respect, with his/her decision to be final and binding upon the parties. The expenses and fees of the arbitrator shall be divided equally between the parties and paid separately by each, regardless of his/her decision.

All other disputes relating to this agreement or the construction of the Vessels shall be litigated in the state or federal courts located in the State of Texas, with both parties hereby consenting to the appropriateness of such forum as well as to the court's exclusive subject matter and personal jurisdiction. The substantially prevailing party in any such litigation shall be entitled to recover its reasonable legal fees and costs.

VESSEL CONSTRUCTION AGREEMENT                                                      PAGE 13

AVEC000023

ER139

**27.    COUNTERPARTS AND FACSIMILE EXECUTION**

This Standard Vessel Construction Agreement, including all attached exhibits, may be executed in one or more counterparts, each of which shall be deemed original and all of which together shall constitute a single agreement. A facsimile or electronic signature shall be equivalent to an original signature.

**28.    INTEGRATION, HEADINGS, NEUTRAL CONSTRUCTION**

This Standard Vessel Construction Agreement, including all attached exhibits, expresses the entire agreement between the parties with respect to the construction of the Vessels, superseding and negating any prior or contemporaneous agreements, written or oral; there are no representations, agreements, arrangements or undertakings between the parties relating to the construction and delivery of the Vessels which are not fully expressed in this agreement. This agreement shall not be modified or amended except through a written instrument signed by both parties. This agreement shall be construed neutrally, and as the commemoration of the mutual assent of both parties, rather than for or against either party. The headings used in this agreement are for convenience of reference only and are not substantive.

DATED this 10 day of June 2010.

OWNER:                                      BUILDER:

Microgen Technologies, Inc.                 Sneed Shipbuilding, Inc.

_Authorized Signature_                      _Authorized Signature_

Meera Kohler    President/CEO               Nathen S. Jones
_Printed Name and Title_                    _Printed Name and Title_

VESSEL CONSTRUCTION AGREEMENT                              PAGE 14

EXHIBIT A

TECHNICAL SPECIFICATION

The technical specification shall include all designs, specifications, plans, drawings and photos on the ftp site maintained by Owner's naval architect, Jensen Maritime Consultants, Inc., at the following address:

ftp://microgen:vitus@ftp.jensenmaritime.com

as of June 8, 2010.

True and correct copies of all such documents are attached to this Exhibit A on a DVD-ROM disk labeled "Microgen Tug and Barge Technical Specification."

VESSEL CONSTRUCTION AGREEMENT                                              PAGE 15

AVEC000025

ER141

**EXHIBIT B**

**FORM OF CHANGE ORDER**

VESSEL CONSTRUCTION AGREEMENT                                    PAGE 16

AVEC000026

ER142

**EXHIBIT B**

**CHANGE ORDER**

**NUMBER** _____

| OWNER | | BUILDER | |
|---|---|---|---|
| Name | : | Name | : |
| Address | : | Address | : |
| City, State | : | City, State | : |
| Contact | : | Contact | : |
| Telephone | : | Telephone | : |
| Facsimile | : | Facsimile | : |
| E-mail | : | E-mail | : |

| VESSEL | | CONTRACT | |
|---|---|---|---|
| Name | : | Title | : Standard Vessel Construction Agreement |
| O. N. | : | Date | : |
| Type/Use | : | Ref. No. | : |

**CHANGE REQUESTED BY:**

**CHANGE IN MATERIALS:**

Original cost of such materials _____
Revised cost of such materials _____
Difference (increase/decrease) _____

VESSEL CONSTRUCTION AGREEMENT                    PAGE 17

AVEC000027

ER143

CHANGE IN LABOR:

Original cost of such labor                  : _____
Revised cost of such labor                   : _____
Difference (increase/decrease)               : _____

CHANGE IN SCHEDULE AND/OR DELIVERY DATE:

Time (delay or advancement)                  : _____
Revised Delivery Date                        : _____

Upon execution by both parties, the foregoing Change Order shall be deemed fully incorporated into the Standard Vessel Construction Agreement between Owner and Builder identified above. This Change Order may be executed in counterparts and/or by facsimile, with a facsimile copy of a signature considered equivalent to an original signature.

DATED this _____ day of _____, _____.

OWNER:                              BUILDER:


_____            _____
Authorized Signature               Authorized Signature

_____            _____
Printed Name and Title             Printed Name and Title


VESSEL CONSTRUCTION AGREEMENT                                    PAGE 16

AVEC000028

ER144

Case: 12-35920      02/11/2013        ID: 8509773      DktEntry: 8-3      Page: 137 of 282

Case 2:11-cv-01375-RAJ   Document 32   Filed 02/13/12   Page 29 of 33

## EXHIBIT C

## DELIVERY CERTIFICATE

| OWNER | | BUILDER | |
|---|---|---|---|
| Name | : | Name | : |
| Address | : | Address | : |
| City, State | : | City, State | : |
| Contact | : | Contact | : |
| Telephone | : | Telephone | : |
| Facsimile | : | Facsimile | : |
| E-mail | : | E-mail | : |

| VESSEL | | CONTRACT | |
|---|---|---|---|
| Name | : | Title | : Standard Vessel Construction Agreement |
| O.N. | : | Date | : |
| Type/Use | : | Ref. No. | : |

The Vessel identified above is tendered for delivery by Builder to Owner pursuant to the Standard Vessel Construction Agreement referenced above.  Concurrently and in accordance with the terms of said agreement, Builder tenders the following documents and/or other items to Owner:

Builder warrants that all work upon the Vessel has been performed and completed in full compliance with the terms and conditions of said agreement, including without limitation the technical specification as identified therein, and that all required tests and trials have been satisfactorily performed, except as follows:

| | Item | Work Days | Dollar Value |
|---|---|---|---|
| 1 | | | |
| 2 | | | |

Owner, having completed its inspection of the Vessel, hereby accepts delivery of the Vessel pursuant to the terms and conditions of said agreement, except as follows:

| | Item | Work Days | Dollar Value |
|---|---|---|---|
| 1 | | | |
| 2 | | | |

VESSEL CONSTRUCTION AGREEMENT                                    PAGE 19

AVEC000029

ER145

DATED this _____ day of _____, _____.

OWNER:                              BUILDER:

_____        _____
Authorized Signature                 Authorized Signature
_____        _____
Printed Name and Title               Printed Name and Title

VESSEL CONSTRUCTION AGREEMENT                                    PAGE 20

AVEC000030

ER146

## EXHIBIT D

## OWNER'S SUPPLY

Owner shall supply the following items to be installed upon/incorporated into the Vessel, pursuant to section 3 of the Standard Vessel Construction Agreement between Owner and Builder:

Owner Furnished Equipment (OFE)

| Vessel/System | OFE Item | Delivery Date | Proposed Vendor |
|---|---|---|---|
| **TUGS** | | | |
| Propulsion | | | |
| | Main Engines | November | NC Power Systems |
| | Transmission Gears | January | NC Power Systems |
| | Engine Controls | December | Kobelt |
| | Nozzle/Rudders | December | Rice Propeller |
| | Propellers | December | Rice Propeller |
| Generators | | | |
| | 58 kw Gen Sets | November | NC Power Systems |
| | 30 kw Gen Sets | November | NC Power Systems |
| Tug Deck Machinery: | | | |
| | Deck Cranes | January | Hydra Pro |
| | Capstans | January | Jonrie/ Wintech |
| ATB Couplings | | | |
| | Pin Assemblies | January | Taisei Engineering |
| | HPU unit | January | Taisei Engineering |
| | Control panel for Phouse | January | Taisei Engineering |
| Electronics - Pilot House | | | |
| | Nav/Com items | February | Various |
| Potable Water | | | |
| | Aqua Matic | December | Sea Recovery |
| **BARGES** | | | |
| Winches | | | |
| | Anchor Winches | January | Jonrie |
| | Anchor and Tackle | February | Various |
| | Spud Winches | February | Pullmaster |
| | Gate Winches | February | Pullmaster |
| Generators | | | |
| | 30 kw Gen Sets | February | NC Power Systems |
| Cargo Pumping System | | | |
| | Cat 4.4L Diesels | January | NC Power Systems |
| | Meters & Strainers | February | NW Pump & Equip |
| ATB Couplings | | | |

VESSEL CONSTRUCTION AGREEMENT                                            PAGE 21

AVEC000031

ER147

Pin Rec' Racks          January          Taisei Engineering

VESSEL CONSTRUCTION AGREEMENT                                    PAGE 22

22  886.0H                                    Vitue Marina  13:22  08/30/2010

AVEC000032

ER148

## EXHIBIT E

### PROGRESS PAYMENT SCHEDULE

| | Benchmark | Payment | 5% Holdback for warranty | Actual Payment |
|---|---|---|---|---|
| 1) | Execution of this agreement | $1,000,000 | $50,000 | $950,000 |
| 2) | Delivery of 90% of steel for Tugs to yard | $600,000 | $30,000 | $570,000 |
| 3) | Delivery of 90% of steel for Barges to yard | $600,000 | $30,000 | $570,000 |
| 4) | Complete hull and flip over Tug hull #1 | $400,000 | $20,000 | $380,000 |
| 5) | Complete hull and flip over Tug hull #2 | $400,000 | $20,000 | $380,000 |
| 7) | Complete superstructure and set on Tug #1 | $400,000 | $20,000 | $380,000 |
| 8) | Complete superstructure and set on Tug #2 | $400,000 | $20,000 | $380,000 |
| 9) | Install Nozzles/Engines/Gears/Shafts Tug #1 | $300,000 | $15,000 | $285,000 |
| 10) | Install Nozzles/Engines/Gears/Shafts Tug #2 | $300,000 | $15,000 | $285,000 |
| 11) | Complete mid body for 175' Barge | $450,000 | $22,500 | $427,500 |
| 12) | Complete mid body for 200' Barge | $450,000 | $22,500 | $427,500 |
| 13) | Complete bow rake module for 175' Barge | $225,000 | $11,250 | $213,750 |
| 14) | Complete bow rake module for 200' Barge | $225,000 | $11,250 | $213,750 |
| 15) | Complete stern rake module for 175' Barge | $225,000 | $11,250 | $213,750 |
| 16) | Complete stern rake module for 200' Barge | $225,000 | $11,250 | $213,750 |
| 17) | Launch 175' Barge | $450,000 | $22,500 | $427,500 |
| 18) | Launch 200' Barge | $450,000 | $22,500 | $427,500 |
| 19) | Delivery and Acceptance of Tug #1 | $200,000 | $10,000 | $190,000 |
| 20) | Delivery and Acceptance of Tug #1 | $200,000 | $10,000 | $190,000 |
| 21) | Delivery and Acceptance of 175' Barge | $300,000 | $15,000 | $285,000 |
| 21) | Delivery and Acceptance of 200' Barge | $325,000 | $16,250 | $308,750 |
| | | $8,125,000 | $406,250 | $7,718,750 |

Note 5% holdback will be paid to Builder 6months after delivery less any amounts used for warranty related repairs.

VESSEL CONSTRUCTION AGREEMENT                                            PAGE 23

AVEC000033

ER149

# EXHIBIT B

The Honorable Richard A. Jones

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| ALASKA VILLAGE ELECTRIC COOPERATIVE, INC., <br><br> Plaintiff, <br><br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, et al., <br><br> Defendants. | Lead Case No. 2:11-cv-01375-RAJ <br><br> and <br><br> Member Case No. 2:11-cv-01819-RAJ <br><br> SUPPLEMENTAL DECLARATION OF JAMES H. BAUER <br><br> NOTE ON MOTION CALENDAR: <br><br> February 17, 2012 (Motion) <br><br> March 9, 2012 (Cross-Motion) |

James H. Bauer declares and states:

1.   I am a citizen of the United States, am over the age of 18 years, have personal knowledge of all matters stated in this declaration, and am competent to testify to the same.  I have read the declarations of Linda Windham (the "Windham Declaration") and John K. Weber (the "Weber Declaration") submitted in connection with the pending summary judgment motions.  I previously submitted a declaration in support of Plaintiff's Combined Opposition to Defendants' Motion for Summary

{00271686-1}SUPPLEMENTAL DECLARATION OF JAMES H. BAUER- 1
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL.
(206) 625-9534 FAX

1  Judgment and Cross-Motion for Partial Summary Judgment. I am submitting this as

2  a supplement to my prior declaration, to address inaccuracies in the Windham

3  Declaration and the Weber Declaration, and to clarify the process by which the

4  Builder's Risk Policy (the "Policy") for Sneed, Microgen and Vitus was procured.

5      2.    The request for the insurance, the configuration of the Policy and the

6  expectations of the Policy originated with me. My background with respect to marine

7  insurance is that it has been a focal point of my career. I became involved in my first

8  evaluation of coverage under a builders risk policy in the fall of 1972, approximately

9  two years before being admitted to practice. My practice from the beginning has

10  focused on marine insurance coverage, and to that end I have assisted principally

11  marine underwriters but also brokers on coverage issues associated with marine

12  insurance policies. I have litigated marine insurance coverage disputes on behalf of

13  marine insurance underwriters, have evaluated and opined on countless coverage

14  situations, have drafted entire marine insurance policies addressing specialty risks

15  and have certainly drafted many revisions, addenda and exclusions for existing

16  forms. I am regularly engaged by marine insurers, brokers and insureds to evaluate

17  not just coverage but entire insuring programs including applications of coverage to

18  practical situations. I have not reviewed the list of the underwriters participating in

19  the present Policy but am confident that I have represented some if not all of them

20  over the years.

21      3.    I did not approach the procurement of builders risk insurance for Sneed in

22  this case in a casual or uninformed fashion, but rather brought to that Policy the

23  entirety of my years of experience and expertise with respect to marine insurance.

24  What I was seeking to obtain for Sneed in that instance, and what based on my years

25  of experience with marine insurance I ended up obtaining from the subscribing

26  marine underwriters on a direct first party basis, was coverage, during the course of

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5900 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA. 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

ER31

Case 2:11-cv-01375-RAJ   Document 42   Filed 03/09/12   Page 3 of 12

1   construction of the vessels, for Sneed's negligence.  Specifically, I obtained coverage
2   for Sneed for faulty workmanship and faulty production procedures, the precise
3   causes of the loss at issue in the matter.
4        4.   The process utilized to obtain this coverage for faulty workmanship and
5   faulty production procedures is straightforward.   Builders risk policies prior to the '79
6   American Institute Builders Risk clauses contained only a single exclusion or
7   limitation upon coverage, found in Part 1 – Hull Section of the form for "faulty design;"
8   the policy was otherwise expressly all risks in scope of cover.  This exclusion is
9   logical as the design virtually inevitably comes from a naval architect who carries his
10  own errors and omissions insurance coverage.
11       5.   The changes to the '79 form did not increase the litany or scope of
12  exclusions or limitations at all; the only exclusion or limitation identified remained
13  "faulty design." The '79 form did not use the words nor did it contain exclusions for
14  "faulty workmanship" or "faulty production procedures" (nor did any of the earlier
15  forms.)  As an experienced marine insurance coverage attorney, my view is that all
16  risks of physical loss or damage to the vessel during the currency of the Policy which
17  are not expressly excluded are covered, and the burden of proof falls upon the
18  underwriter to prove not only the existence but the applicability of an exclusion.
19       6.   In 1979, as well as before and after this date, I believed and continue to
20  believe the '79 builders risk clauses provide coverage for "faulty workmanship" and
21  "faulty production procedures."  And the Marine insurance industry agrees with me.
22  My own experience with marine underwriters and marine brokers, my daily diet, is
23  absolutely to that effect.
24       7.   The most obvious verification of this position is the American Hull Insurance
25  Syndicate itself, and Mr. Weber's comments in this regard are not only in error but
26  appear to be calculated to intentionally mislead.  First, there is the basic matter of

{00271686-1} SUPPLEMENTAL DECLARATION OF JAMES H.
BAUER- 3
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL.
(206) 625-9534 FAX

ER32

1    routine rules of construction for contracts and specifically for insurance contracts.

2    The '79 form was drafted and imposed by marine underwriters, and when drafted

3    they had control of the words which they could use and the exclusions they could

4    insert. As underwriters offering an all-risk cover, they knew they had to expressly

5    state an exclusion as none would (or ever should) be imputed or created.

6    Underwriters knew enough to exclude "faulty design" and the words were certainly

7    available if they had wished to exclude "faulty workmanship" or "faulty production

8    procedures." They chose not to use those words so exclusions for "faulty

9    workmanship" and "faulty production procedure" did not exist.

10       8.   Secondly, marine underwriters expressly acknowledged the foregoing in

11    1981 when the AHIS issued Addendum No. 2. Mr. Weber states that the coverage

12    afforded under the '79 clauses is the same with or without Addendum No. 2. Mr.

13    Weber could not be more mistaken. He also states that Addendum No. 2 was not

14    designed "to change coverage, but more emphatically affirm the original intent..."

15    That latter statement is in error. The AHIS statement issued on April 24, 1981

16    (Attachment 1, hereto) states: "Essentially, the **changes** effected by the Addendum

17    are as follows:" A "change" is not an affirmation, regardless of what Mr. Weber, for

18    the self-interest of Zurich in this matter, would want the Court to believe. A "change"

19    is a "change;" AHIS expressly used the term "change" itself, so Mr. Weber's comment

20    that AHIS was not changing coverage is patently in error.

21       9.   Also, for the first time, AHIS expressly uses the words "excludes," "faulty

22    workmanship," and "faulty production procedures." Those words were in common

23    use in 1979 and could have been inserted in the basic '79 clauses, but were not.

24    They were incorporated into the '79 form only through Addendum No. 2. Addendum

25    No. 2, for the first time and in the only document which exists, superimposes and

26    adds exclusions for "faulty workmanship" and "faulty production procedures."

{00271686-1} SUPPLEMENTAL DECLARATION OF JAMES H.
BAUER- 4
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

ER33

10.  Mr. Weber makes the comment that Addendum No. 2 is not an AIMU form. That may well be true from a technical perspective, but it is all but universally attached onto the '79 clauses -- which clauses are an AIMU form.   My own experience involving approximately 40 years with respect to marine insurance is that it is commonly treated within the marine insurance industry to be a form approved by AIMU.  In reality, brokers and underwriters use a variety of versions of Addendum No. 2 (all worded identically but some formatted differently), only a few of which specifically identify AHIS (Attachment 2 is an example).

11.  Similarly, and in direct contrast to Mr. Weber's suggestions, my own experience with respect to marine insurance underwriters is that their starting point for builders risk is the '79 form plus Addenda Nos. 1 and 2.  This has been reaffirmed countless times throughout my career but the most immediate reference would be the Sneed placement itself.  For builders risk coverage, I first spoke with Sneed's own marine insurance broker.  Ordinarily I expect the Builder to provide the builders risk insurance so that is why I started with Sneed.  When I spoke with Mitch Jones and Sneed's broker, both told me the Sneed program used the '79 clauses but included Addendum No. 2.  I told the Sneed broker we needed to delete Addendum No. 2 to obtain coverage for faulty workmanship and faulty production procedures.  He told me that Addendum No. 2 was a mandatory part of builders risk insurance in the Gulf of Mexico area and that underwriters would not delete it as it would broaden coverage.

12.  As I could not get what I needed for Sneed out of the Gulf, I then turned to the Vitus/Microgen broker, Chris Bader, to obtain the coverage from the Seattle marketplace.  His first response was that it was always a part of builders risk, he wasn't sure he could get it deleted, and if he did it would probably cost more money. He undertook to procure the requested format for builders risk, and Sneed and

{00271686-1} SUPPLEMENTAL DECLARATION OF JAMES H.
BAUER- 5
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

1  Microgen adjusted contract language in contemplation of the increased cost for

2  broadened coverage (subsection 14.b (3) in the Standard Vessel Construction

3  Agreement).

4      13. My own experience in the marine insurance industry is that marine insurers

5  clearly understand deletion of Addendum No. 2 broadens coverage by deleting the

6  express exclusions (not found in the basic '79 clauses themselves) for "faulty

7  workmanship" and "faulty production procedures." I have had countless discussions

8  with marine underwriters and brokers over the years and have never had anyone

9  disagree or express doubt on this point.

10     14. I have read the Windham Declaration, and specifically paragraph 4, in

11  which Linda Windham states that "I did not agree and was not asked to provide

12  coverage for the costs of repair for defective work by the yard . . .", and that "[N]either

13  Mr. Bader, Ms. Collins, nor Mr. Bauer asked that of us, and I certainly did not agree

14  to do so." To the contrary, as I specifically testified at paragraph 10 of my first

15  declaration in this case, during the underwriting process, and prior to Ms. Windham's

16  agreement to commit ISI as a subscribing underwriter on the Policy, Ms. Windham

17  called me to discuss the builder's risk insurance for this project, and specifically the

18  request to omit Addendum No. 2. I specifically told her that the two most common

19  risks of shipbuilding, faulty workmanship and faulty vessel construction, are excluded

20  under Addendum No. 2, and that Sneed wanted Addendum No. 2 removed so that

21  there would be coverage under the builder's risk policy for claims based upon faulty

22  workmanship and faulty production procedures.  Given my conversation with Ms.

23  Windham, she absolutely knew Sneed's intent in requesting the omission of

24  Addendum No. 2 from the Policy was that the Policy would cover faulty workmanship

25  and faulty production procedure.

26

{00271686-1}SUPPLEMENTAL DECLARATION OF JAMES H.
BAUER- 6
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

15. Mr. Weber implies that somehow the AHIS is oriented toward "blue water," though the point of his reference is lost on me. The factual reality is that Addendum No. 2 is regularly and I believe uniformly included with the '79 AIMU builders risk clauses for all marine vessel construction, "blue water" or otherwise.

16. Mr. Weber notes for the Court's benefit that he is a CPCU, chartered property and casualty underwriter. If so, I would note that the American Institute for CPCU, where Mr. Weber obtained his certification, puts out a course text on "Ocean Marine Insurance." In Volume 2, 2nd Edition of the text, page 133, first full paragraph, it explicitly states that Addendum No. 2 is regularly requested to be deleted by brokers to broaden coverage for their shipyard clients. This would not seem to me to be a confirmation of Mr. Weber's position that the coverage is the same with or without Addendum No. 2, or that Addendum No. 2 is a reaffirmation of exclusions never stated and not existing in the basic form.

17. I also note that the standard marine insurance text used by courts, marine underwriters, maritime coverage attorneys and marine insurance brokers, which is *Buglass, Marine Insurance and General Average in the United States*, specifically states the base '79 builders risk clauses provide coverage for "accidents in the building of the vessel by employees of the yard, such as damage caused by negligence of workmen" (p. 460, Third Edition) (Attachment 3). That is precisely what occurred here, and Buglass' view is completely consistent with all of my experience as a marine insurance coverage attorney.

18. The exclusions contained in Addendum No. 2 refer explicitly to negligence: "faulty" is a synonym for negligence and faulty workmanship and faulty production procedures are negligence concepts. There is no subject more frequently insured by insurers than the negligence of their own insureds (standard public liability policies, homeowners, auto and certainly builders risk) and I wanted that coverage for Sneed.

{00271686-1}SUPPLEMENTAL DECLARATION OF JAMES H. BAUER- 7
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5500 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL
(206) 625-9534 FAX

ER36

1   I also wanted to avoid controversy and wanted to use the available insurances to
2   solve what to me is a routine commercial situation.
3       19.  I had a choice at the beginning of the request for placement of builder's risk
4   insurance in this case to simply ask for the '79 hull clauses without referencing
5   Addendum No. 2. My overt choice was to force the specific reference point to be the
6   '79 clauses with Addendum No. 2 deleted, meaning the starting point for the Policy
7   was the '79 clauses with Addendum No. 2, then Addendum No. 2 (with the only
8   express exclusions for faulty workmanship and faulty production procedures) was
9   expressly to be deleted, meaning the exclusions are overtly (and not merely
10  inadvertently) deleted.  I cannot think of any way to be clearer to underwriters and I
11  believe this approach plainly manifests to the underwriters Sneed's intent, and in turn
12  obtains the bargained for scope of coverage for faulty workmanship and faulty
13  production procedures.  Underwriters knew exactly what was going on as Mr. Bader
14  sent each of them with a copy of the construction agreement, which expressly set the
15  reference point as the '79 clauses with Addendum No. 2, then taking Addendum No.
16  2 away (subsection 14.A(1)).
17      20.  In my view the most routine risks associated with vessel construction result
18  from faulty workmanship and faulty production procedures, and if those are not
19  covered, there is no significant point to paying for builders risk insurance.
20      I declare under penalty of perjury under the laws of the State of Washington that
21  the foregoing is true and correct.
22      DATED this 8 day of March, 2012, at Seattle, Washington.
23
24                                    James H. Bauer
25
26

{00271686-1} SUPPLEMENTAL DECLARATION OF JAMES H.
BAUER- 8
2:11-cv-01375-RAJ and 2:11-cv-01819-RAJ

MONTGOMERY PURDUE BLANKINSHIP & AUSTIN PLLC
ATTORNEYS AT LAW
5400 BANK OF AMERICA TOWER
701 FIFTH AVENUE
SEATTLE, WA 98104-7096
(206) 682-7090 TEL.
(206) 625-9534 FAX

ER37

*Attachment 1*

AMERICAN HULL INSURANCE SYNDICATE
ADDENDUM NO. 2 TO THE
AMERICAN INSTITUTE BUILDER'S RISKS CLAUSES
(February 8, 1979)

Essentially, the changes effected by the Addendum are as follows:

Faulty Design:   There has been added to this section a list of
several functions which are incidental to the overall design it-
self.  The purpose of the change is to distinguish the treatment
in the policy of faults in performing such functions from the
faulty workmanship coverage.

Faulty Workmanship, Etc.:  This clause excludes damage resulting
from faulty workmanship unless resulting in destruction, etc. of
a part itself, in which case the cost of repairing or renewing
the part plus consequential damage, if any, is recoverable.  This
change is principally intended to eliminate the "do over" type of
claim based on mere discovery.  However, even if improper or de-
fective materials are used and result in destruction, etc., the
cost of repairing or replacing such material is not recoverable,
only the consequential damage, if any.

Faulty Production or Assembly Procedures:  Damage occurring in
consequence of the use of such procedures is excluded even if
they could be construed as being part of the design.  Under this
clause there is no coverage for either the part itself or for any
consequential damage.

Subrogation:  A specific provision regarding subrogation has been
added which is self-explanatory.

4/24/81

ER38

Attachment 2

**ADDENDUM NO. 2 to the**
**AMERICAN INSTITUTE BUILDER'S RISKS CLAUSES**
**(February 8, 1979)**

HULL RISKS
Lines 61-62 of the attached policy are hereby deleted and the following substituted therefore:

Subject to the provisions of exclusion (b) of the following paragraph, in the event that faulty design of any part or parts should cause physical loss of or damage to the Vessel this insurance shall not cover the cost or expense of repairing, replacing or renewing such part or parts, nor any expenditure incurred by reason of a betterment or alteration in the design. Faulty design shall include, but not be limited to, errors, omissions, or deficiencies in plans, drawings, specifications, or calculations.

Further, Underwriters shall not pay for any loss, damage, or expense caused by or arising in consequence of:

(a) faulty workmanship, or the installation or use of improper or defective materials, unless resulting in destruction, deformation, breaking, tearing, bursting, holing, or cracking of the Vessel, or any other like condition, and which loss, damage or expense is not otherwise excluded under the terms and conditions of the War, Strikes and Other Exclusions Clause of the attached Policy; provided that Underwriters in no event shall respond for the cost or expense of repairing, replacing, or renewing any improper or defective materials;

(b) faulty production or assembly procedures even if constituting faulty design.

SUBROGATION
The following provision is added after line 205 of the attached policy:

In case of any agreement or act, past or future, by the assured whereby any right of recovery of the Assured against any person or entity is released or lost to which these Underwriters on payment of loss would be entitled to subrogation but for such agreement or act, this insurance shall be vitiated to the extent that the right of subrogation of these Underwriters has been impaired thereby; and in such event the right of these Underwriters to retain or collect any premium paid or due hereunder shall not be affected.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Insured:                                          Policy No.

Effective Date:                                   Endorsement No.

ER39



Attachment 3

# MARINE INSURANCE
## AND GENERAL AVERAGE IN THE
## UNITED STATES

*An Average Adjuster's Viewpoint*

LESLIE J. BUGLASS

*Member of the Association of Average Adjusters
of the United States*

THIRD EDITION

CORNELL MARITIME PRESS
Centreville, Maryland



Chapter 10

## Miscellaneous Insurances of a Special Nature

### SHIPBUILDING INSURANCES

Under most building contracts the vessel, as it is constructed, and all materials, etc., allocated to the "new building" become the property of the builders; furthermore, the vessel is at the risk of the builders until delivered to her ultimate owner. Invariably the delivery is effected afloat after satisfactory trials and the builder is responsible for her trial trip. Consequently, the builder is exposed to various third party liabilities and must protect himself by appropriate insurance. Thus, although the coverage provided by Builder's Risks clauses (see Appendix A) is basically an insurance against physical loss or damage to the hull insured, it is wider in many respects than that provided by the usual hull insurances. In particular, since builders cannot become members of shipowners' Protection and Indemnity clubs, it is essential that builders be provided with coverage against such liabilities.

Most Builder's Risks insurances are effected on "all risks" terms and cover "all risks" of physical loss of or damage to the subject-matter insured." However, the term "all risks" must not be taken too literally for it is basic that even under such wide terms, underwriters' liability is normally confined to fortuitous damage or loss and does not cover any loss, damage, or expense which is inevitable at the inception of the risk.

In general, Builder's Risks policies cover:

(a) Any damage to the vessel (or parts destined for it and not yet on the vessel but in the custody of the yard) caused by some accident, casualty, or fortuitous event.

(b) "Accidents" in the building of the vessel by the employees of the yard, such as damage caused by negligence of workmen.

(c) Consequential damage due to errors in design, manufacture, or workmanship.

(d) In case of failure of launch, all subsequent expenses incurred in completing the launch.

(e) All claims are payable without deductions "new for old."

460

# EXHIBIT B

THE HONORABLE RICHARD A. JONES

1

2

3

4

5

6

7        UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
8            AT SEATTLE

9  | ALASKA VILLAGE ELECTRIC | IN ADMIRALTY AND AT LAW |
   | COOPERATIVE, INC., an Alaska | |
10 | corporation, | Lead Case No. 2:11-cv-01375-RAJ |
   | | |
11 | Plaintiff, | Member Case No. 2:11-cv-01819-RAJ |
   | | |
12 | v. | DECLARATION OF LINDA WINDHAM |
   | | IN SUPPORT OF REPLY ON MOTION |
13 | ZURICH AMERICAN INSURANCE | FOR SUMMARY JUDGMENT |
   | COMPANY, a New York corporation; | |
14 | NATIONAL UNION FIRE INSURANCE | NOTED FOR HEARING: |
   | COMPANY OF PITTSBURGH, PA, | February 17, 2012 |
15 | THROUGH CHARTIS GLOBAL MARINE, | |
   | a Pennsylvania corporation; NATIONAL | |
16 | CASUALTY COMPANY, a Wisconsin | |
   | corporation; GREAT AMERICAN | |
17 | INSURANCE COMPANY OF NEW YORK, | |
   | a New York corporation; and STARR | |
18 | INDEMNITY & LIABILITY COMPANY, a | |
   | Texas corporation, | |
19 | | |
   | Defendants. | |
20

21        I, Linda Windham, declare as follows from my own first-hand knowledge:

22        1.  I am now and was in the summer of 2010 the Executive Director of International

23  Specialties, Inc ("ISI"), a general agent for Scottsdale Insurance Company and a number of

24  its subsidiaries.  One of those subsidiaries is a marine insurer, National Casualty Co,

25  ("National").  As such, I and ISI are authorized to underwrite certain classes of insurance

26  risks for National, including builder's risk coverages. Our authority to do so is per written,

DECLARATION OF LINDA WINDHAM IN SUPPORT
OF REPLY ON MOTION FOR SUMMARY JUDGMENT:
Lead Case No. 2:11-cv-01375 - 1
PDX/111581/182524/DFK/8957081.1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone 503.222.9981  Fax 503.796.2900

1   specific underwriting guidelines from Scottsdale and National. I have been involved in

2   marine underwriting for over 40 years in the Northwest marine insurance market, and I am

3   intimately familiar with the scopes of coverages afforded by the builder's risk contract at

4   issue in this case.

5       2. In the summer of 2010, I was contacted by Seattle broker FIS Marine and queried

6   about our willingness to participate in a builder's risk arrangement for two new build barges

7   to be constructed by Sneed Shipyards down in Texas. I was told by Chris Bader of FIS

8   Marine that the coverages would need to be issued without Addendum Number 2, and it is a

9   fact that I was reluctant to agree to participate in the risk initially, and declined at first to take

10   a part of the risk.

11      3. On July 19, 2010, Ms. T. J. Collins of FIS Marine e-mailed me (a copy of her

12   e-mail is attached to this declaration as Exhibit 1). In it, she told me that Zurich had agreed

13   to take the lead on a builder's risk contract for the new builds, with 25% of the coverage,

14   without inclusion of Addendum 2, and that two other marine insurers had also agreed to

15   participate. She explained that she had spoken to Mr. David Fowler of Zurich about Mr.

16   Fowler's reasoning for agreeing to write the coverage without Addendum 2. Ms. Collins

17   wrote me that "Addendum # 2 is only a 'clarifying' addendum to the builder's risk clauses."

18   This satisfied any concern I had about the breadth of coverage being sought, and I agreed to

19   participate for National on the risk at Ms. Collins' request.

20      4. I understood us to be providing the standard, accepted scope of builder's risk

21   coverages. I did not agree and was not asked to provide coverage for the costs of repair for

22   defective work by the yard or for "warranty work." Neither Mr. Bader, Ms. Collins, nor

23   Mr. Bauer asked that of us, and I certainly did not agree to do so. Our arrangements with

24   Scottsdale and National would not have permitted me to do so, and I would not have done so

25   in any event. I would not have taken the line we did accept had it not been for Ms. Collins'

26   assurances that the coverages were in line with our underwriting requirements and my

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone 503.222.9981  Fax 503.796.2900

1  understanding of the scope of coverage.  On the strength of her explanation, I agreed to

2  commit National to a participation in the policy ultimately issued to Vitus Marine.  I did not

3  intend and did not agree to cover warranty costs.

4        I declare under penalty of perjury under the laws of the State of Washington that the

5  foregoing is true and correct.

6  Dated this *16th* day of February 2012.

7

8                                      _Linda Windham_
                                        Linda Windham

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF LINDA WINDHAM IN SUPPORT
OF REPLY ON MOTION FOR SUMMARY JUDGMENT:
Lead Case No. 2:11-cv-01375 - 3
PDX/111581/182524/DFK/8957081.1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone 503.222.9981  Fax 503.796.2900

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 |     I hereby certify that on the 17th day of February, 2012, I caused to be served the |
| 3 | foregoing DECLARATION OF LINDA WINDHAM IN SUPPORT OF REPLY ON |
| 4 | MOTION FOR SUMMARY JUDGMENT on the following parties via United States District |
| 5 | Court – Western District of Washington's Electronic Case Filing System ("ECF") at the |
| 6 | following addresses: |

7
- **Claire L. Been**
8   cbeen@schwabe.com,centraldocket@schwabe.com,dbrooks@schwabe.com
- **Evan T Caffrey**
9   ecaffrey@hallmaineslugrin.com
- **Andrew R Chisholm**
10   achisholm@mpba.com,eservice@mpba.com
- **Christopher Ogilvie Davis**
11   codavis@bakerdonelson.com
- **David Ryan Ebel**
12   debel@schwabe.com,jhicok@schwabe.com,docket@schwabe.com
- **Michael E Gossler**
13   mgossler@mpba.com,eservice@mpba.com
- **Scarlett B Hunter**
14   shunter@schwabe.com,rdavies@schwabe.com,centraldocket@schwabe.com
- **Bert W. Markovich**
15   bmarkovich@schwabe.com,rsherwood@schwabe.com,centraldocket@schwabe.com
- **Jonathan Robert Moore**
16   jmoore@mpba.com,eservice@mpba.com
17

18                                     SCHWABE, WILLIAMSON & WYATT, P.C.

19

20         By:

21                            Bert W. Markovich, OSB #841211
                           David R. Ebel, WSBA #28853

22                            Claire L. Been, WSBA #42178
                           Attorneys for Defendants

23                            Zurich American Insurance Company,
                           National Union Fire Insurance Company

24                            of Pittsburgh, PA, through Chartis
                           Global Marine, National Casualty

25                            Company, Great American Insurance
                           Company of New York, and Starr

26                            Indemnity & Liability Company

CERTIFICATE OF SERVICE - 1
Lead Case No. 2:11-cv-01375

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone 503.222.9981 Fax 503.796.2900

PDX/111581/182524/DFK/8957081.1

# EXHIBIT   1

Declaration of Linda Windham, Exhibit 1, Page 1 of 2

Page 2 of 2

Linda Windham
International Specialty, Inc.
2101 Fourth Avenue
Suite 2050
Seattle, WA  98121

206-615-3093

lwindham@intlspecialty.com

**From:** TJ Collins [mailto:TJ_Collins@ajg.com]
**Sent:** Monday, July 19, 2010 5:24 PM
**To:** 'Linda Windham'
**Cc:** 'Becky Sanders'; Chris Bader
**Subject:** Vitas Marine - Builder's Risk - Info on addendum 2 and other participants

Dear Linda,
I wanted to provide you with our builder's risk submission and ask you to reconsider this risk.  At this time, we now have the following participation and we would very much like to have your participation.

25% Zurich - lead
25% Chartis
15% Great American

I spoke to Dave Fowler about why he was willing to write this builder's risk without addendum # 2 and he advised that:
1.)  Addendum # 2 is only a 'clarifying' addendum to the builder's risk clauses.
2.)  He reviewed his other builder's risk policies and programs and found that several were written by their office without addendum # 2.
3.)  He felt that this is a good risk that he wants to participate on afterwards and wanted to be a part of the builder's risk to start.
4.)  He also liked it that the Standard Vessel Construction Agreement was drafted by Jim Bauer of Bauer, Moynihan and Johnson.

We hope with this information that you will reconsider and take a participating line.

Thank you.  TJ

TJ Collins
FIS Marine / AJ Gallagher RMS, Inc.
**Direct Line:  206 607-0926**
Cell:  206 370-2818
Main Phone:  206 270-3400
FAX:  206 270-3409
Email address  tj_collins@ajg.com

*I would like to emphasize that the discussion set forth above is only an insurance/risk management perspective and is not legal advice.  We do not provide legal advice as we are not qualified to do so.  I highly recommend that you seek the advice of legal counsel in order to become fully apprised of the legal implications related to these issues.*

7/23/2010

Declaration of Linda Windham, Exhibit 1, Page 2 of 2

# EXHIBIT C

THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALASKA VILLAGE ELECTRIC COOPERATIVE, INC., an Alaska corporation,

Plaintiff,

v.

ZURICH AMERICAN INSURANCE COMPANY, a New York corporation; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, THROUGH CHARTIS GLOBAL MARINE, a Pennsylvania corporation; NATIONAL CASUALTY COMPANY, a Wisconsin corporation; GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, a New York corporation; and STARR INDEMNITY & LIABILITY COMPANY, a Texas corporation,

Defendants.

IN ADMIRALTY AND AT LAW

Lead Case No. 2:11-cv-01375-RAJ

Member Case No. 2:11-cv-01819-RAJ

DECLARATION OF JOHN K. WEBER IN SUPPORT OF REPLY ON MOTION FOR SUMMARY JUDGMENT

**NOTED FOR HEARING: February 17, 2012**

John K Weber declares as follows:

1. I am a Vice President of Zurich Global Marine in its New York City offices, a position I have held for six years now. As such, I am Zurich Marine's Product Line Director for Hull and Marine Liability coverages in North America, meaning I am the ultimate head of underwriting for these types of marine coverages, including builder's risk coverages. I am also a CPCU, or Chartered Property and Casualty Underwriter, the standard US professional



SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone 503.222.9981 Fax 503.796.2900

1    designation for underwriters in the property and casualty field. Additionally, I have been

2    employed in the marine insurance business for over thirty years, beginning in 1977. I am the

3    current chair of the Liability Committee at the American Institute of Marine Underwriters

4    (AIMU). I am a past Chair of the AIMU Forms & Clauses Committee. I teach insurance,

5    including marine insurance, as an adjunct professor at St John's University, and I teach

6    marine insurance for the AIMU.

7         2. I have reviewed the material submitted to date on behalf of the assureds in this

8    controversy, including the affidavits of Mr. Bader and Mr. Bauer.

9         3. Mr. Bauer's summary of the history and meaning of Addendum Two, and the

10    consequences of its non-inclusion in the coverages afforded are in error. Addendum Two was

11    a creation of the American Hull Insurance Syndicate. It has never been adopted by the

12    AIMU, and is in fact not even listed as a market form by the AIMU on its web site. It is

13    occasionally and even frequently used, but certainly not consistently nor universally, it

14    having been created by the American Hull Insurance Syndicate for its "blue water," ocean-

15    going line of business. The Syndicate has never been more than peripherally involved in the

16    underwriting of domestic coastwise and inland craft like these two vessels. When the

17    Syndicate first issued Addendum Two, moreover, it did so by a letter making it clear that it

18    was doing so not to change coverage, but to more emphatically affirm the original intent of

19    the Hull Syndicate builders risk form. Mr. Bauer is incorrect when he asserts the omission of

20    Addendum Two somehow expands the coverage afforded to include repair costs for

21    defective workmanship by a yard on a vessel under construction. Whatever Mr. Bauer may

22    have intended, that is not the construction, the meaning, or the coverage afforded by the

23    American Institute Builder's Risk Form, and his opinion is most certainly not shared by the

24    marine insurance industry in general or by me personally.

25         4. David Fowler called me to ask for my authorization to bind this risk without

26    Addendum Two. I asked him specifically why the request was being made. He wrote me on

DECLARATION OF JOHN K. WEBER IN SUPPORT OF
REPLY ON MOTION FOR SUMMARY JUDGMENT:
Lead Case No. 2:11-cv-01375 - 2
PDX/111581/182524/DPK/8953000.1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone 503.222.9981  Fax 503.796.2900

1   July 15 of 2010 (via e-mail), to say "I spoke to the broker who advises that attorney Jim

2   Bauer insists that Addendum No. 2 be stricken from coverage." Mr. Fowler and I discussed

3   it, and we e-mailed one another.  I explained that, in my view, not including the Addendum

4   made no difference in coverage and that this addendum was frequently not included on

5   builder's risk programs on which we participated; Mr. Fowler agreed, and we confirmed that

6   in an e-mail. He did not relate to me any intent or request to provide coverage for the costs of

7   repairing defective work by the shipbuilder, and I'd not have given him authority to write it if

8   he had.  I would not have approved warranty coverage.  That warranty obligation is the

9   shipbuilder's, and in my view, the builder's risk insurers are as entitled to the faithful

10  performance of the warranted level of performance as any other participant in the risk.  In the

11  event, I gave Mr. Fowler my authorization to proceed as he had already tentatively quoted to

12  the broker for the risk. I was most certainly not authorizing coverage for defective yard work

13  repair costs which are, I understand secondhand, the only form of damages claimed here.

14          I declare under penalty of perjury under the laws of the State of Washington that the

15  foregoing is true and correct.

16          Dated this _16 4th_ day of February 2012.

17

18                                                                        _[signature]_

19                                                    John K. Weber

20

21

22

23

24

25

26

DECLARATION OF JOHN K. WEBER IN SUPPORT OF
REPLY ON MOTION FOR SUMMARY JUDGMENT:
Lead Case No. 2:11-cv-01375 - 3
PDX/111581/182524/DFK/8953000.1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone 503.222.9981  Fax 503.796.2900

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

1

2       I hereby certify that on the 17th day of February, 2012, I caused to be served the

3  foregoing DECLARATION OF JOHN K. WEBER IN SUPPORT OF REPLY ON MOTION

4  FOR SUMMARY JUDGMENT on the following parties via United States District Court –

5  Western District of Washington's Electronic Case Filing System ("ECF") at the following

6  addresses:

7
- **Claire L. Been**
8    cbeen@schwabe.com,centraldocket@schwabe.com,dbrooks@schwabe.com
- **Evan T Caffrey**
9    ecaffrey@hallmaineslugrin.com
- **Andrew R Chisholm**
10    achisholm@mpba.com,eservice@mpba.com
- **Christopher Ogilvie Davis**
11    codavis@bakerdonelson.com
- **David Ryan Ebel**
12    debel@schwabe.com,jhicok@schwabe.com,docket@schwabe.com
13
- **Michael E Gossler**
    mgossler@mpba.com,eservice@mpba.com
14
- **Scarlett B Hunter**
    shunter@schwabe.com,rdavies@schwabe.com,centraldocket@schwabe.com
15
- **Bert W. Markovich**
16    bmarkovich@schwabe.com,rsherwood@schwabe.com,centraldocket@schwabe.com
- **Jonathan Robert Moore**
17    jmoore@mpba.com,eservice@mpba.com

18                                                    SCHWABE, WILLIAMSON & WYATT, P.C.

19

20                    By:

21                           Bert W. Markovich, OSB #841211
                             David R. Ebel, WSBA #28853
22                           Claire L. Been, WSBA #42178
                             Attorneys for Defendants
23                           Zurich American Insurance Company,
                             National Union Fire Insurance Company
24                           of Pittsburgh, PA, through Chartis
                             Global Marine, National Casualty
25                           Company, Great American Insurance
                             Company of New York, and Starr
26                           Indemnity & Liability Company

CERTIFICATE OF SERVICE – 1
Lead Case No. 2:11-cv-01375 - 2

SCHWABE, WILLIAMSON & WYATT, P.C
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone 503.222.9981 Fax 503.796.2900

PDX/111581/182524/DFK/8953000.1

# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALASKA VILLAGE ELECTRIC     )
COOPERATIVE, INC., an Alaska )
corporation,                   )
                              )
          Plaintiff,     )
                              )     No. 2:11-cv-01375-RAJ
         vs.               )
                              )
ZURICH AMERICAN INSURANCE    )
COMPANY, et al.,           )
                              )
         Defendant.     )
-------------------------------------------
ZURICH AMERICAN INSURANCE    )
COMPANY, et al.,           )
                              )
          Plaintiff,     )
                              )
         vs.               )     No. 2:11-cv-01819-RAJ
                              )
VITUS MARINE, L.L.C.,       )
et al.,                  )
                              )
         Defendant.     )

DEPOSITION UPON ORAL EXAMINATION OF

CHRIS BADER

DATE:  May 29, 2014

REPORTED BY:  Thad E. Byrd
              C.S.R. No. 2052

Page 44

```
 1        after the telephone conversation you had had with him?
 2   A.   Yes.
 3   Q.   Did you and Mr. Fowler discuss Addendum 2 during that
 4        telephone call that you had in between those two
 5        E-mails?
 6   A.   What I remember from that call was that he should
 7        contact Jim Bauer and address any of his questions or
 8        concerns so that was my recollection of that call.
 9             From what I remember, I don't know if the
10        timing was right, but I said to call him.  He called
11        him and it seemed like shortly thereafter is when he
12        agreed to not having Addendum No. 2 so I don't know
13        what was discussed on that call.
14   Q.   So he didn't tell you during that call that he wanted
15        to cover the cost of repairing faulty workmanship?
16   A.   My recollection was that he was concerned about faulty
17        design and said that that wasn't an issue because it
18        expanded upon the existing faulty design exclusion in
19        the hull section of the basic form and that he should
20        call Jim.  After that call was when he agreed so that
21        was the extent of the call.  It was pretty straight
22        forward.
23   Q.   You didn't tell him during that call that you were
24        looking for coverage for the cost of repairing faulty
25        workmanship; did you?
```

Page 45

1    A.    I said that he should call Jim and that was when he

2          changed his mind after that call.

3    Q.    So at the conclusion of your call with Fowler, you did

4          not know whether he had changed his mind or not?

5    A.    Correct because I said why don't you talk to Jim.

6    Q.    And it was after talking to Jim Bauer that he changed

7          his mind.  Is that your understanding?

8    A.    Correct.

9    Q.    Did Mr. Fowler tell you during that conversation that

10         he had spoken with his national claims V.P. about

11         Addendum No. 2?

12   A.    No.  I don't remember that coming up.

13   Q.    Fowler agreed to delete Addendum No. 2 at no increased

14         premium; right?

15   A.    That's what it says, yes.

16   Q.    Is that your recollection?

17   A.    Yes and it says it right here.

18   Q.    Doesn't that indicate to you that Mr. Fowler thought

19         that the deletion of Addendum No. 2 didn't change the

20         scope of coverage?

21   A.    I wouldn't read into it that way.

22   Q.    Why not?

23   A.    Because we negotiate changes in coverage and terms all

24         the time and sometimes at no additional premium.  It

25         depends on the marketplace because we go through hard

Page 64

1   A.   Well, there would be coverage in the policy for that.

2   Q.   I'm asking --

3   A.   I think that an underwriter uses different terms than

4        I would.  They're talking about warranty and we're

5        just talking about the scope of coverage provided by

6        the policy.

7   Q.   When Ms. Collins sent this E-mail in Exhibit 41 that

8        said do not write warranty coverage, did you respond

9        to her and say no, this isn't warranty coverage?

10  A.   I don't remember if we talked or if she -- It seemed

11       like she talked to Bauer shortly thereafter.  I don't

12       remember if we called her.  I don't know if there was

13       another exchange of E-mails after that, but I think

14       that she talked to Jim.

15  Q.   She talked to Jim and then later changed her mind?

16  A.   Correct.

17  Q.   It seems like that happens a lot.  Did that happen to

18       Mr. Fowler as well?

19  A.   That's what I told you earlier.  Just for your

20       benefit, I didn't sit down and re-read everything that

21       transpired four years ago like we're doing now.  I'm

22       just going to the best of my recollection.

23  Q.   I understand.  Take a look at the E-mail that's been

24       marked as Exhibit 42.  The E-Mail from T.J. to you

25       starts with the sentence, "I spoke with Dave Fowler at

Page 65

1       Zurich and asked why he was okay not to have Addendum

2       No. 2 on this risk."  Were you on that call?

3    A.   No.  That's from T.J. to me.

4    Q.   So you weren't on that call with Dave Fowler and T.J.?

5    A.   It's from her to me.  I don't believe so.

6    Q.   Do you know why she called him?

7    A.   We market policies day in day out so it's not unusual.

8    Q.   Did you ask her to call him and find out why he was

9       okay not to have Addendum No. 2 on this risk?

10   A.   I don't recall.

11   Q.   When she wrote, "Also, Addendum No. 2 is a clarifying

12      addendum of what is already contained in the American

13      Institute builder's risk clause," did you E-mail or

14      call Dave Fowler to tell him that that is inconsistent

15      with your understanding?

16   A.   No.  The only call I had was when I said for him to

17      call Jim.  He came back and said he would put up a

18      lead quote.  I don't remember the chronology, but that

19      was the extent.

20   Q.   Three minutes after this E-mail from T.J. to you, it

21      looks like she E-mails you back and says, "P.S.  Based

22      on this info, I think I'll try one more time with

23      Linda at I.S.I. to see if she'll reconsider."

24           Did you respond to T.J. at that time telling

25      her that this information is different than what

Page 66

1    Linda's understanding of Addendum 2 is?

2    A.   I don't believe so.  Usually when you say you'll try

3         an underwriter to see if they'll reconsider, it's

4         because you've got an underwriter that's agreed to put

5         up a lead, a lead underwriter role.

6              Typically when you get -- If you have no

7         interest, then it's not as easy to have an underwriter

8         reconsider, but if they see more underwriters signing

9         up, then they're more open to being on the slip so I'm

10        sure that's what she meant.

11   Q.   Did you have a conversation with T.J. about this

12        Fowler conversation besides what's in this E-mail?

13   A.   I don't recall unless it's somewhere in this packet

14        here.

15   Q.   Exhibit 43 has been handed to you.  Is this the

16        follow-up E-mail or the one more try from T.J. to

17        Linda?

18   A.   It appears so.  Let me look at the chronology here.

19        July 19th, yeah, what she put in that previous E-mail.

20        It's not uncommon in our industry to approach an

21        underwriter and go back to them later on any risk, a

22        fish boat or what have you.

23   Q.   So in the re line of this E-mail is Vitus Marine,

24        builder's risk, info on Addendum 2 and other

25        participants.  Info on No. 2 and other participants,

Page 87

```
 1                         A F F I D A V I T

 2


 3    STATE OF WASHINGTON    )
                             )  ss.
 4    COUNTY OF KING         )

 5

 6              I have read my within deposition and the

 7    same is true and correct, save and except for changes

 8    and/or corrections, if any, as indicated by me on the

 9    "CORRECTIONS" flyleaf page hereof.

10

11

12              _____
                              CHRIS BADER

13

14              SUBSCRIBED AND SWORN to before me this

15    _____ day of _____ 2014.

16

17

18              _____
                NOTARY PUBLIC in and for the
                State of Washington residing
19              at _____.

20              My commission expires:

21              _____

22

23

24

25
```

# EXHIBIT E

Page 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALASKA VILLAGE ELECTRIC      )
COOPERATIVE, INC., an Alaska )
corporation,                 )
                             )
            Plaintiff,       )
                             )        No. 2:11-cv-01375-RAJ
        vs.                  )
                             )
ZURICH AMERICAN INSURANCE    )
COMPANY, et al.,             )
                             )
            Defendant.       )
─────────────────────────────────────────────────────────
ZURICH AMERICAN INSURANCE    )
COMPANY, et al.,             )
                             )
            Plaintiff,       )
                             )
        vs.                  )        No. 2:11-cv-01819-RAJ
                             )
VITUS MARINE, L.L.C.,        )
et al.,                      )
                             )
            Defendant.       )

─────────────────────────────────────────────────────────

DEPOSITION UPON ORAL EXAMINATION OF

JAMES H. BAUER

─────────────────────────────────────────────────────────

DATE:  May 22, 2014

REPORTED BY:  Leslee J. Unti
              C.S.R. No. 2678

Page 6

1    Q.    All here, sir?

2    A.    Pardon?

3    Q.    All here in Seattle?

4    A.    Yes.

5    Q.    And you are how old?

6    A.    I don't think my age is relevant.

7    Q.    Mr. Bauer, I may ask any number of questions that you

8          may not think are relevant.  We're taking a deposition

9          and objections will be made by your attorney.  I'd

10         appreciate it if you'd simply answer the questions.

11         Now, would you please advise --

12   A.    No, I'm not going to answer your question.

13         Mr. Gossler is A.V.E.C.'s attorney and not my

14         attorney.  I'm happy to tell you how many years I've

15         practiced law and provide data like that, but I think

16         personal information as to my age is not relevant and

17         doesn't need to be disclosed.  You're aware you have a

18         mechanism for resolving that matter.

19   Q.    I am and we'll see how far this goes.

20   A.    Sure.

21   Q.    In the late spring and early summer of 2010,

22         Mr. Bauer, as this shipbuilding contract at issue in

23         this case was being negotiated and the coverages

24         placed, how many of the five insurers who ultimately

25         subscribed to the builder's risk contract at issue in

Page 7

1      this case was your firm then representing?

2  A.  I have no idea.

3  Q.  Well, let's talk about it.  Zurich, did your office

4      then represent Zurich?

5  A.  I'm going to decline to answer that question.  I think

6      the R.P.C.'s are involved, particularly 1.6, and I

7      think that goes to client confidentiality.  My view of

8      1.6 is that it has been interpreted broadly so in many

9      circumstances, the identity of a client might well

10     constitute confidential information and further --

11  Q.  Mr. Bauer --

12  A.  -- if I may finish, I'm further concerned that there

13     may be attorney client privileges.  Now, in neither

14     instance am I as a lawyer in a position to authorize

15     disclosure of confidential information or waive the

16     privilege without the informed consent of the client.

17  Q.  Well, I agree you may not disclose a privilege without

18     the informed consent of your client.  I'm simply

19     asking whether in the late spring of 2010, the clients

20     of this firm included Zurich.

21  A.  I'm not going to answer that question.  I've stated my

22     concerns.

23  Q.  Will you answer the following question?  At the same

24     time, did your firm represent National Union Fire

25     through Chartis?

Page 8

1   A.   It's the same objection.  Pursuant to the R.P.C.'s,

2        1.6 in particular, it could be 1.9 or 1.8 as well in

3        some circumstances, I believe communications as to

4        whether I represented a given entity would be

5        considered within the scope of confidentiality.

6             I'm not at liberty to disclose confidences and

7        I'm at risk under the R.P.C.'s if I do so without the

8        informed consent of my client and I don't have that

9        informed consent.

10  Q.   I have the same question of National Casualty Company

11       and we may as well ask about their M.G.A.,

12       International Specialties.  Did your firm have an

13       attorney client relationship with them in the spring

14       of 2010?

15  A.   I decline to answer pursuant to the R.P.C.'s,

16       particularly 1.6, as well as potentially attorney

17       client privilege.  I believe disclosure of that

18       information would be inappropriate.

19  Q.   I ask the same question as to the Great American

20       Companies.

21  A.   And I would answer that I decline to provide that

22       information because I believe pursuant to 1.6, that

23       will constitute a client confidence and may well

24       involve attorney client privilege as well and without

25       the informed consent of the client, I'm not at liberty

1      to do so.

2  Q.  Let me ask you the same question, sir, about Starr

3      Indemnity.

4  A.  I would answer in the same fashion.  As far as I'm

5      concerned, R.P.C. 1.6 as well as other R.P.C.'s and

6      perhaps attorney client privilege would prevent me

7      from answering that without the informed consent of my

8      client.

9  Q.  Do you recognize this, Mr. Bauer, as the initial

10     declaration you filed in this lawsuit back in February

11     of 2012?

12  A.  It appears so.

13  Q.  I'll represent to you that I believe it to be that

14     plus the attachments to your exhibit.  In this and

15     other declarations, you state in your declarations

16     that you had a conversation with Ms. Linda Windham

17     about the coverages being sought for this particular

18     project.  Did you speak to any other of the

19     subscribers prior to placement of this risk?

20  A.  I'm going to have to break down the answer somewhat if

21     you'll follow with me.  First of all, I don't know

22     when the risk was placed, but if I answer further, I

23     certainly did receive a call from Linda Windham.

24         I believe I may have received a call from

25     someone else pertinent to the placement, but I cannot

Page 10

1      tell you right now who that might have been.

2   Q.  Would you perhaps have kept any notes of the

3       conversation with that other individual?

4   A.  I've never taken notes as an attorney.

5   Q.  Turn, please, to Paragraph 10 of this initial

6       declaration which we're calling Exhibit No. 1 and if

7       you'd just read that to yourself.

8   A.  [Witness complied.]

9   Q.  You say, "I recall a couple of interested underwriters

10      writing in the Seattle marine insurance marketplace

11      and with whom I had existing relationships called me

12      to discuss the builder's risk insurance for this

13      project."  One of those, I take it, was Ms. Windham?

14  A.  Yes.

15  Q.  What was the nature of your existing relationship with

16      Ms. Windham?

17  A.  She knew me.

18  Q.  Was she a client?

19  A.  She knew me and that was my reference to an existing

20      relationship.  The people who called me knew me and

21      called me directly.

22  Q.  Are you declining to answer whether that relationship

23      included a current attorney client relationship?

24  A.  That's correct.  I'm declining.

25  Q.  Does this perhaps refresh your recollection as to who

Page 14

```
 1   A.   Certainly.

 2   Q.   -- and it remains your opinion now?

 3   A.   It's not industry standard in the sense that leaving

 4        it attached to a builder's risk policy is industry

 5        standard.  The form itself is standard and has been

 6        available since the early '80's.

 7   Q.   You also state, "It is a very substantial limitation

 8        upon the scope of coverage" -- Does that remain your

 9        opinion?

10   A.   It certainly does.

11   Q.   -- "and none of the marine insurance brokers with

12        which I have dealt over the years has been willing to

13        accept it."  Does that remain your opinion today, your

14        belief today?

15   A.   Yes.  In their discussions with me, they're unwilling

16        to accept it, what they end up with in negotiations

17        with the underwriters, but in the first instance, it's

18        been my understanding and still remains my

19        understanding that they view it the same way I do.

20   Q.   Can you tell me some of those brokers who won't accept

21        it, sir?

22   A.   No.  Once again, I refer to the R.P.C.'s on

23        confidentiality, 1.6 in particular -- It can be 1.9 or

24        1.8 -- and as well, in many of those instances, there

25        would be an attorney client relationship.
```

Page 28

1    Q.    Exhibit No. 1, the initial addendum, did you draft

2          this yourself, Mr. Bauer?

3    A.    Let's see.  I think that falls within the scope of

4          perhaps attorney client privilege.  I'm not sure it's

5          appropriate for me to answer questions with regard to

6          what I thought or what I did other than in context

7          with contact with third parties which would be outside

8          the scope of privilege.

9                I don't personally want to run any risks with

10         attorney client privilege so I think I will decline to

11         answer on that basis.

12   Q.    Were you paid by your client, Microgen, to prepare

13         Exhibit 1?

14   A.    I think that clearly falls within the scope of

15         attorney client privilege.  It probably falls also

16         within the scope of the R.P.C.'s.

17   Q.    Well, when you signed it, did you agree with -- Let's

18         not worry about the exhibits.  Let's just talk about

19         the several pages of declaration through Page 6.

20               When you signed it on the 13th day of February

21         2012 under penalty of perjury, does that mean you

22         agreed with every averment in the preceding six pages?

23   A.    I signed it and said that the answer is yes.

24   Q.    In Paragraph 3 on Page 2 of your declaration,

25         Exhibit No. 1, you talk about your firm's template

Page 38

```
 1          it is viewed as a limitation on coverage and they will
 2          seek to have it deleted to expand coverage or broaden
 3          coverage.
 4    Q.    I'll ask you to take a look at Paragraph 13 of
 5          Exhibit No. 6, your declaration, second declaration.
 6    A.    Uh-huh.
 7    Q.    In it you talk about -- Well, it reads, "My own
 8          experience in the marine insurance industry is that
 9          marine insurers clearly understand deletion of
10          Addendum No. 2 broadens coverage by deleting the
11          express exclusions not found in the basic '79 clauses
12          themselves for faulty workmanship and faulty
13          production procedures.
14               I have had countless discussions with marine
15          underwriters and brokers over the years and have never
16          had anyone disagree or express doubt on this point."
17               Tell me, sir, who those marine underwriters
18          and brokers are with whom you've had countless
19          discussions.
20    A.    That would fall within 1.6 again and in many instances
21          would fall within the scope of attorney client
22          privileges.
23    Q.    Let me try to limit it then.  Let's limit it just to
24          the five insurers on this risk.  Do you contend that
25          any of those countless discussions you've had with
```

Page 39

```
 1        marine underwriters include any of the insurers on
 2        this risk?
 3   A.   I am not going to provide any information with regard
 4        to any work or discussions that I have ever had or
 5        done with any of the underwriters on this risk to
 6        anyone, you included.
 7             Pursuant to 1.6, it's certainly client
 8        confidentiality, but to the extent that attorney
 9        client privilege applies, I would assert it as well.
10   Q.   Please read Paragraph 14 there on Page 6 to yourself
11        as well.
12   A.   [Witness complied.] Yes.
13   Q.   Now, again, no notes of that conversation exist at
14        least here at Bauer, Moynihan; correct?
15   A.   I do not take notes.
16   Q.   Apparently when you wrote this, you had read
17        Ms. Windham's declaration which in Paragraph 4 is
18        stated, "I did not agree and was not asked to provide
19        coverage for the costs of repair for detective work by
20        the yard."  Do you contend you did tell her you wanted
21        that?
22   A.   Yes.  I contend that I specifically told her we were
23        looking for coverage for faulty workmanship, for
24        negligence which is fault, faulty workmanship and
25        faulty production procedures.
```

Page 45

1    A.    Correct.

2    Q.    This is in May of 2011.  What was your purpose in

3          writing this E-mail?

4    A.    After Mitch Jones and Mark Smith left my office on

5          whatever date that was subject to the request from

6          Chris Bader or someone from his office and the contact

7          from Linda, I had no contact with the project until I

8          was informed that the vessels were being rejected by

9          A.B.S. because the welds had inadequate penetration

10         and at that point, I informed both Sneed and the

11         Vitus/A.V.E.C. people that the purpose in

12         reconfiguring the insurance was to pick up claims of

13         that type and recommended that they submit a claim.

14   Q.    Were you aware of the identity of the insurers when

15         you made that recommendation?

16   A.    I don't believe so.

17   Q.    For the record, two pages Bates stamped B.M.J. 526 and

18         527, E-mails.  Ms. Matejovsky is who, Mr. Bauer?

19   A.    She is a claims person with Gallagher.

20   Q.    Did she relate to you precisely whom that underwriter

21         with a substantial percent of the slip was with whom

22         she'd had a conversation where is the damage?

23   A.    I'm not sure at what point she informed me, but at

24         some point, she informed me that Zurich was the lead

25         insurer.

Page 46

1    Q.    Well, as it happens, I'll represent to you, Mr. Bauer,

2          that the individual making that phone call to

3          Ms. Matejovsky and asking where the damage was

4          Ms. Goheen.  Did you learn that roughly

5          contemporaneous with this exchange?

6    A.    I'm not sure I was aware who the other underwriters

7          were because Jeanne continuingly referenced Des

8          Serpanchy.

9    Q.    So did you know, not know or just not recall at this

10         date whether it was Ms. Goheen to whom

11         Ms. Matejovsky had reference?

12   A.    I certainly didn't know who Jeanne was talking about.

13   Q.    Did you at this stage ask who the other underwriters

14         might be?

15   A.    I doubt I would have asked.  I wouldn't have had any

16         reason for asking.  Someone would have to tell me.

17   Q.    Would that not be perhaps an inquiry you might make to

18         find out if you had a conflict about giving coverage

19         advice?

20   A.    I see no basis for conflict.

21   Q.    You have mentioned that she'd mentioned Zurich as lead

22         and mentioned Mr. Serpanchy down in San Francisco.

23         Did you know at the time of that exchange in June,

24         early June of 2011, Zurich was a current client of

25         your firm?

Page 48

1    Q.   Well, you may then have no recollection and be unable

2         to answer the question of what was the purpose of the

3         exchange between you and Ms. Matejovsky of a proposed

4         communication with Mr. Serpanchy?  Was it to influence

5         his decision on coverage?

6    A.   I wouldn't have any recollection at this point as to

7         the purpose.

8    Q.   While Mr. Bauer is reviewing, I'll state that

9         Exhibit 12 consists of a total of five pages, the

10        first two Bates stamped Sneed 691 -- It's four pages.

11             The first two are Sneed 691 and two.  The last

12        two are Sneed 1102 and 1103.  Those are the Bates

13        stamps.  Do you recognize those four pages, Mr. Bauer?

14   A.   Not really.

15   Q.   Do I take it that you crafted this E-mail to Mr. Mitch

16        Jones dated June 14th of 2011?

17   A.   I would assume so.

18   Q.   And did you or your office prepare the two-page

19        attachment, Sneed 1102 and 1103?

20   A.   No.  I'm pretty sure we didn't.  I'm not totally sure.

21        Maybe someone here typed it, but I have no

22        recollection of preparing that.  It's not the way I

23        write.

24   Q.   Do you believe that the two documents that we have

25        Bates stamped Sneed 1102 and 1103 are, in fact, the

Page 49

```
 1           attachment referenced in your E-mail to Mitch Jones on

 2           June 14th?  "I'm also attaching a preliminary damage

 3           summary."

 4    A.     I don't know.  I really don't have any recollection.

 5    Q.     I'll represent to you that the latter two pages were

 6           provided to us by Mr. Gossler when we asked where the

 7           attachment was for Sneed 691 and 692.  Do you have any

 8           reason to believe that they weren't sent along with

 9           your E-mail to Mr. Jones?

10    A.     No reason to believe they weren't.

11    Q.     Mr. Bauer, I went through the Bauer, Moynihan

12           production rather carefully and I did not find the

13           E-mail Bates stamped 691, 692 nor the damage summary

14           Bates stamped 1102 and 1103 among the materials you

15           produced.  Rather, these came from the Sneed

16           production.  Have you any notion why these documents

17           may not have been produced?

18    A.     I can't imagine how they couldn't have been produced.

19           When I responded to the Subpoena Duces Tecum, I

20           supervised the production of documents.

21                 I think one or more of our legal assistants

22           did it and I don't maintain correspondence in folders

23           on a business file.  There's too much and I leave it

24           in my Outlook so I simply directed that all the inbox

25           and sent items be sorted and everything involving
```

```
                                                      Page 51
 1              MR. KNOX:  That's why I printed it as well.
 2   Q.   The summary was in excess of $3.6 million dollars of a
 3        potential claim, I take it, by A.V.E.C. against Sneed
 4        Shipbuilding.  Did you present that claim to Sneed
 5        Shipbuilding as at least a potential claim?
 6   A.   At a certain point early on in the claims process,
 7        Sneed and A.V.E.C. put me in basically an intermediary
 8        role and used me to pass documents back and forth.
 9              Early on, I asked Mitch Jones whether he
10        wanted to get his attorney or someone involved on his
11        side and he specifically requested that I remain
12        involved.  He felt comfortable dealing with me.
13              These documents may well have passed through
14        my computer, but it doesn't mean I read or paid any
15        great attention to them.  I was simply trying to move
16        things along between the parties.
17   Q.   Was your client A.V.E.C.?
18   A.   My client would have remained A.V.E.C., Microgen and
19        Vitus without any hesitation.
20   Q.   The shipbuilding contract that you negotiated capped
21        damages for late delivery of $210,000; did it not?
22   A.   There was a liquidated damage provision.  I would have
23        to look at the contract.  I don't know what it is
24        offhand.
25   Q.   Well, we can find that for you.  Did it, in fact,
```

Page 53

1   Q.   Did Mr. Jones ever raise that clausing as a potential

2        defense to the $3.6, $3.7 million dollar statement of

3        claim presented to him?

4   A.   I don't recollect myself, but once again, I really

5        didn't pay a great deal of attention at that stage.

6   Q.   Did you recommend to Mr. Jones that he might want to

7        get a lawyer involved in the negotiations over the

8        claim?

9   A.   I think I just told you -- I previously testified that

10       I had suggested to Mitch -- I'd asked him if he didn't

11       want an attorney involved on his behalf.

12  Q.   If you said that, I apologize.  I do not recall you

13       saying that.  You said he was comfortable with your

14       involvement.

15  A.   Before I said that, I said that I had asked him and he

16       declined and he was comfortable and asked me to remain

17       involved recognizing that I was the attorney for

18       A.V.E.C.

19  Q.   Did you play any role thereafter in the negotiation of

20       the conclusion of the potential claim by your clients

21       against Sneed?

22  A.   My recollection is that I functioned as an

23       intermediary meaning I didn't take an active role.

24  Q.   Just for the record, this is a two-page excerpt of an

25       E-mail exchange bearing the Bates numbers A.V.E.C. 783

Page 54

```
 1        and 784.  The second portion of this beginning at the

 2        bottom of Page 1 of Exhibit 13 appears to be an E-mail

 3        from you to Mr. Jones.  Do you recall writing that,

 4        Mr. Bauer?

 5   A.   I don't specifically recall writing it, but I have no

 6        reason to believe I didn't.

 7   Q.   Do you recall the conversation that apparently

 8        occurred on June 1st of 2011?

 9   A.   No, I don't really recall that conversation or a

10        specific conversation on that date.

11   Q.   So as you sit here today, you don't have a

12        recollection.  On the second page, the second full

13        paragraph states in part, "On behalf of A.V.E.C., I

14        proposed an alternate solution that would net A.V.E.C.

15        a little over $1.9 million.

16             It would involve forgiving the further

17        progress payments, A.V.E.C. retaining the holdback and

18        Sneed paying the $210,000 in liquidated damages all to

19        occur at delivery."  You don't remember proposing that

20        on behalf of A.V.E.C.?

21   A.   I don't specifically remember proposing that.  What I

22        think I recollect is that this may have been a summary

23        that came after a conference call that involved a

24        number of personnel, A.V.E.C. personnel, and Mitch

25        Jones and myself.  That's the best I can do.
```

Page 55

1   Q.   To the best of your knowledge, it would not have

2        involved a lawyer still at that point for Sneed or

3        Mr. Jones?

4   A.   I left it up to Mitch to decide whether he wanted to

5        involve an attorney or not.  He remained adamant

6        throughout that he would prefer to take care of this

7        himself commercially.

8   Q.   It also says that on behalf of A.V.E.C., that proposal

9        you made included that Sneed would retain the

10       insurance claim payments.

11            A.V.E.C. would surrender the $1 million letter

12       of credit.  Sneed did not retain any right to the

13       insurance payments; correct?

14  A.   I don't believe so.

15  Q.   Did Mr. Jones or anyone else at Sneed tell you why

16       they were disinterested in retaining the rights to the

17       potential proceeds of the insurance claim?

18  A.   Not that I recall.  At this point what I can recollect

19       from reading this, my only recollection is that there

20       were very fluid discussions and they were directly

21       between the parties.  I was on the phone.

22  Q.   In the end, there were assignments of any proceeds

23       under the builder's risk claim; correct?

24  A.   I believe so.

25  Q.   Running to the benefit of whom?

Page 56

1    A.    Let me go back, your question, there were assignments.

2          I can't recollect now precisely the form of the legal

3          documents used.  Someone would have to show them to me

4          at this point.  They may well have been in the form of

5          assignments.

6                These things can be resolved in lots of

7          different fashions.  I don't honestly recall precisely

8          how the relationship between Sneed and A.V.E.C. was

9          wrapped up.

10   Q.    Do you recall forwarding to Sneed documents to sign,

11         the effect of which was to sign over their right to

12         any proceeds on an insurance claim to your clients?

13   A.    Yeah.  I recall generally that the end resolution

14         between Sneed and A.V.E.C. was such that A.V.E.C.

15         agreed that it would take the insurance claim --

16                There was a division between the two parties

17         and I believe I forwarded the final documents to Mitch

18         for execution.  I'm not absolutely certain of that,

19         but I believe.

20   Q.    Now, from reading these reams and reams of paperwork,

21         the defects in the welds, the hairline cracks, the

22         insufficient penetration were discovered in a series

23         of inspections and some sort of examination by the

24         A.B.S. with machinery far beyond my ability to

25         understand beginning in early or mid April of 2011.

Page 59

1    A.    That would be attorney client privilege clearly.

2    Q.    For the record, this is a one-page document Bates

3          stamped A.V.E.C. 753.  Mr. Bauer, do you recall

4          getting this E-mail from Mr. Jones?

5    A.    I don't have a specific recollection at this point of

6          having received it.  I assume I did because it's

7          addressed to Jim Bauer.  By the way, I don't recognize

8          the name Jackie Fay that appeared on the last two

9          E-mails.

10         MR. GOSSLER:  I can answer that.  I think you

11         forwarded these documents to our office electronically

12         and we printed them and Jackie Fay was a legal

13         assistant in our office.

14         THE WITNESS:  When we sent the document

15         production?

16         MR. GOSSLER:  Yes.

17   Q.    Did you respond to Mr. Jones and tell him why the

18         delay?

19   A.    I don't recollect.

20   Q.    Exhibit 16, just for the record, is a document Bates

21         stamped A.V.E.C. 797 dated July 18, 2011.  Mr. Bauer,

22         do you recall drafting and sending this E-mail to

23         Mr. Jones and the other addressees?

24   A.    I don't recall it specifically, but it certainly

25         appears to be what I drafted and sent.

Page 60

1    Q.   It describes a conversation that Ms. Matejovsky may

2         have had with a surveyor and the lead claims person

3         and kind of describes the status of the claim against

4         the builder's risk coverage.

5              In the fourth paragraph, the second sentence,

6         you write, "As our firm does work for the builder's

7         risk insurers, we have a conflict of interest."

8    A.   Correct.

9    Q.   Now, Mr. Bauer, as of the date you wrote this to

10        Mr. Mitchell Jones, which of the builder's risk

11        insurers was your firm doing work for?

12   A.   What I will tell you is that this was the first notice

13        to me that there would be controversy with the claim

14        and at that point, I was aware who the lead

15        underwriter was.

16             I was aware that we could not proceed with the

17        claim because it appeared it was heading toward

18        controversy so I did raise a conflict of interest

19        issue and suggested other counsel become involved.

20   Q.   For the record, Exhibit 17 is an E-mail apparently

21        from Mr. Bauer bearing Bates stamp A.V.E.C. 826.

22             Mr. Bauer, do you recall writing this E-mail

23        on or about July 18th of 2011 to Mr. Mitchell Jones?

24   A.   I don't have a specific recollection, but, once again,

25        I have no reason to believe I did not.  It appears to

Page 65

```
 1                    (A short recess was taken.)

 2   Q.   Mr. Bauer, I have only a couple more questions.

 3        First, are you or your office still representing

 4        A.V.E.C., Vitus Marine or Microgen with respect to the

 5        current controversy?

 6   A.   I believe a continuing attorney client relationship

 7        exists until this matter is finally resolved.

 8   Q.   Today, sir, is your client, A.V.E.C., Vitus or

 9        Microgen Marine paying for your time?

10   A.   I don't believe that has to be disclosed within the

11        context of attorney client privilege.

12             MR. KNOX:  All right.  Thank you.  That will

13        conclude my questioning for today.  I want to thank

14        you for your patience and your agreement to appear.

15             Mr. Gossler, as we briefly discussed, I will

16        to the extent it makes any difference reserve the

17        right to re-open this deposition if and when we should

18        elect to pursue relief from the Court concerning some

19        of the responses.  I'm done.

20             THE WITNESS:  Are there any questions of me?

21             MR. GOSSLER:  I have no questions.  Thank you.

22

23                  (The deposition concluded

24                    at 11:00 a.m.

25                    Signature was reserved.)
```

Page 66

```
 1                C E R T I F I C A T E

 2   STATE OF WASHINGTON )
                         ) ss.
 3   COUNTY OF KING      )

 4

 5       I, the undersigned Washington Certified Court Reporter

 6   authorized to administer oaths and affirmations in and for

 7   the State of Washington, do hereby certify:

 8       That the deposition of the witness named herein was

 9   taken stenographically before me and reduced to a typed

10   format under my direction, that the witness was given the

11   opportunity to examine, read and sign the deposition unless

12   indicated that the review was waived, that all objections

13   made at the time of said examination have been noted by me,

14   that I am not a relative or employee of any such attorney

15   and am not financially interested in the said action or

16   outcome, that the deposition as transcribed is a full, true

17   and correct transcript of the testimony including all

18   questions, answers and objections, if any, of counsel.

19       IN WITNESS WHEREOF, I have hereunto set my hand on this

20   26th day of May 2014.

21

22

23                     _____
                       Leslee J. Unti, Certified Court
24                     Reporter, No. 2678, in and for the
                       State of Washington residing at
25                     Kirkland, Washington.
```

Page 67

1                          A F F I D A V I T

2

3    STATE OF WASHINGTON    )
                            )  ss.
4    COUNTY OF KING         )

5

6              I have read my within deposition and the

7    same is true and correct, save and except for changes

8    and/or corrections, if any, as indicated by me on the

9    "CORRECTIONS" flyleaf page hereof.

10

11

12                        _____
                                    JAMES H. BAUER
13

14              SUBSCRIBED AND SWORN to before me this

15    _____ day of _____ 2014.

16

17

18                        _____
                          NOTARY PUBLIC in and for the
                          State of Washington residing
19                        at _____.

20                        My commission expires:

21                           _____

22

23

24

25